THE JAEGER FIRM, PLLC
STEVEN R. JAEGER
23 Erlanger Road
Erlanger, KY  41018
Telephone:  859/342-4500
859/342-4501 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES A. CAPUTO
M. ALEXANDRA ROYAL
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION AT COVINGTON

| | |
|---|---|
| In re GENERAL CABLE CORPORATION SECURITIES LITIGATION | Master File No. 2:14-cv-00022-WOB-CJS |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |
| | DEMAND FOR JURY TRIAL |

940903_1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

JURISDICTION AND VENUE .....................................................................................4

PARTIES .........................................................................................................................5

GENERAL CABLE'S FINANCIAL STATEMENTS WERE MATERIALLY FALSE
   AND VIOLATED GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
   AND SEC REQUIREMENTS.......................................................................................8

   The Defendants Improperly Recognized Revenue on "Bill and Hold" Sales ...................9

   Defendants Failed to Take Charges for Missing Inventory, Related Tax Assets,
      and Inventory Accounting Errors in Violation of GAAP .......................................12

   General Cable Improperly Accounted for Foreign Currency Reserves............................14

   Defendants' Other Accounting Misstatements Also Artificially Increased
      Earnings .....................................................................................................................15

   General Cable's Restatements ........................................................................................16

   General Cable's Financial Restatements Were Material ....................................................17

   The Circumstances of General Cable's Restatements Further Evidence Scienter ...........20

   The Type of Restatements (General Cable's "Misuse of the Facts") ...............................21

   The Duration of the Improper Accounting ......................................................................21

   The Magnitude of the Restatements ................................................................................22

   The Misstatements Served to Boost Net Income Artificially ...........................................23

   General Cable Failed to Institute and Maintain Adequate Internal Controls and
      Falsely Reported the Internal Controls' Effectiveness ...........................................23

   The Individual Defendants Knew or Disregarded that the  Sarbanes-Oxley
      Certifications They Signed Were False ...................................................................25

   Defendants Purported Assessment of the Design and Effectiveness of  Internal
      Controls Would Have Detected the Truth ...............................................................26

   Defendants Falsely Stated How They Evaluated the Internal Controls............................29

DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING THEIR
    FINANCIAL REPORTING AND GENERAL CABLE'S INTERNAL
    CONTROLS ..................................................................................................30

    Defendants' Initial Admission that General Cable's Financial Statements Were
        Materially False and Would Be Restated and the Continuing Falsity of
        Their Financial Reporting ......................................................................39

    General Cable Discloses Its Previous Restatement Is Materially Flawed and that
        Its Financial Statements Must Be Restated a Second Time...................46

FURTHER ALLEGATIONS OF DEFENDANTS' SCIENTER...................................47

    Individual Defendants Were Legally Obligated to Ensure Effective  Financial
        Controls and Repeatedly Assured Regulators and Investors  that General
        Cable's Financial Controls Were Effective ..........................................47

    General Cable's History of Ineffective Financial Controls Put Kenny and
        Robinson on Notice of the Need to Impose Effective Controls over Its
        ROW Operations and Further Evidences Scienter.................................49

    Following the PDIC Acquisition, Kenny and Robinson Failed to Impose Internal
        Controls Over Its International Operations Despite Knowledge of the
        Company's History of Ineffective Internal Controls ............................51

    General Cable's Post-Restatement Measures Identify Reasonable and Readily
        Available Practices that General Cable Failed to Employ During the Class
        Period  to Ensure Sound Business, Accounting and Internal Control
        Practices ................................................................................................55

    The Misconduct in This Case Was Motivated by Millions of Dollars in Incentive
        Compensation and Severe Business Pressures on the Operating Units................57

    Individual Defendants' Incentive Compensation..............................................57

LOSS CAUSATION AND ECONOMIC LOSS....................................................58

APPLICABILITY OF THE PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-
    MARKET DOCTRINE ................................................................................60

NO SAFE HARBOR ........................................................................................61

CLASS ACTION ALLEGATIONS ...................................................................61

COUNT I .......................................................................................................63

COUNT II ......................................................................................................66

PRAYER FOR RELIEF ...................................................................................67

JURY DEMAND ...........................................................................................................68

## INTRODUCTION

1.      This is a securities fraud class action on behalf of all persons or entities that purchased the securities of General Cable Corporation ("General Cable" or the "Company") between November 3, 2010 and October 14, 2013, inclusive (the "Class Period").  Lead Plaintiff City of Livonia Employees' Retirement System ("Lead Plaintiff" or "Retirement System") brings this action against General Cable and certain of its officers for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Both before and during the Class Period, General Cable employed grossly inadequate internal financial reporting controls that resulted in, *inter alia*, improper revenue recognition; understated cost of sales; overstated operating income, net income and earnings per share; and the failure to detect tens of millions of dollars of inventory lost through theft.  In turn, General Cable issued materially false financial results that, as defendants were forced to admit, had to be restated – twice.  Basic internal controls would have prevented or unquestionably detected these problems. And although General Cable's senior executives repeatedly assured regulators and investors that they had tested and found effective General Cable's internal controls over financial reporting and disclosure, those assurances, too, were false.

3.      General Cable is one of the world's largest manufacturers of cable and wire for industrial uses.  Its operations focus on the production of high-quality aluminum, copper and fiber optic wire and cable, and systems solutions.  Operating around the world, General Cable trumpets its "strengths in technology and manufacturing" and that the Company is "competitive in such areas as distribution and logistics."

4.      In October 2007, General Cable sought to expand its international operations and acquired Phelps Dodge International Corporation ("PDIC") as a privately held subsidiary.  General Cable represented that this acquisition was expected to accelerate its globalization plans and would

- 1 -

capture fast growing markets in the developing economies PDIC served.  Immediately following this acquisition, General Cable realigned the Company's management and financial reporting structure into three geographic segments, North America, Europe and Mediterranean, and a new grouping called Rest of World ("ROW").  General Cable co-located PDIC and ROW in Miami, Florida headquarters and put them under the control of Mathias Sandoval, who had been PDIC's Chief Executive Officer ("CEO") and President for the previous six years.

5.     Despite the obvious need to integrate PDIC into General Cable's internal management and internal financial reporting controls, former employees have confirmed that PDIC's financial systems were not integrated with the rest of the Company and that the financial reporting process was not transparent.  Remarkably, when General Cable's corporate finance department would attempt to obtain information beyond the numbers that ROW reported to corporate headquarters, the head of ROW would throw a tantrum and go "ballistic," refusing to provide information.  More remarkably, rather than support the corporate finance department personnel's efforts and insist on transparency and cooperation, Gregory B. Kenny ("Kenny") and Brian J. Robinson ("Robinson"), General Cable's CEO and Chief Financial Officer ("CFO"), respectively, would acquiesce to ROW's refusal to share information and would instead instruct the controller to "back off" and accuse him of not getting along.  Management's guidance was not to interfere as ROW appeared to be a successful operation.

6.     In fact, Kenny and Robinson's insistence on allowing ROW to operate without meaningful financial supervision or transparency prevented the ROW region and its internal control processes and procedures, which were carried over from PDIC, from being integrated effectively into General Cable's reporting structure.  This permitted a multitude of material accounting irregularities to occur, including improperly recognizing tens of millions of dollars of revenues and

- 2 -

allowing tens of millions of dollars of raw materials and finished goods to be stolen in Brazil over a period of at least five years – right under the Company's nose.

7.      The missing inventory problem was reportedly acknowledged by ROW's management in January 2012, but was not addressed by corporate headquarters until September 2012.  It then took General Cable over four months to revise its financial statements because of the magnitude of the inventory and related accounting problems.

8.      This, however, was not the end of it.  On October 15, 2013, almost a year after the Company announced the necessary restatement, General Cable revealed it had to restate essentially the same public financial statements a second time.  The second restatement was necessary to correct tens of millions of dollars of improperly recognized revenue on certain Brazilian sales, correct material errors in Value Added Tax ("VAT") assets related to the missing Brazil inventory, and correct a host of other accounting irregularities unrelated to Brazil.  The second restatement re-restated all the Company's previously filed public financial reports addressed in the first restatement, as well as the year-end 2012 financial report and the financial reports in 3Q12 and 1Q13.[1]  This restatement took another 11 months to complete.  In total, General Cable ultimately had to admit that its publicly issued financial statements for a period of at least 5 years, that is, 22 successive public quarterly and annual financial reports, had been false and could not be relied upon.

9.      The sheer magnitude of the restatements and the fact that two restatements of previously issued financial statements were even needed evidence that much more than mere negligence was at work in the Company's internal financial controls and reporting.  And the resulting false statements are all the more surprising given that General Cable, on Kenny's watch,

---

[1]    For the purposes of brevity and convenience, fiscal quarters are referred to by their number and year.  Thus, the first fiscal quarter of 2013 is abbreviated "1Q13."  Fiscal years are abbreviated by FY and year.  FY2008, for example, represents fiscal year 2008.  General Cable's fiscal year is contemporaneous with the calendar year.

had to respond previously to inventory and revenue recognition control problems very similar to that present during the Class Period. For example, only three years before the misconduct alleged here, General Cable had been forced to revise the then current financial statements in order to disclose materially flawed internal controls relating to receiving inventory in other geographic locations.

10. As a result of defendants' false and misleading financial statements and internal control assurances, General Cable securities traded at artificially inflated prices during the Class Period. However, after the revelations concerning the unreliability of the Company's reported financial results and its wholly ineffective internal financial reporting controls, General Cable's common stock experienced significant selling pressure, sending the Company's stock price to 40% of its Class Period high.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the United States Securities and Exchange Commission ("SEC"). Jurisdiction is conferred by §27 of the 1934 Act (15 U.S.C. §78aa).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

13. Venue is proper pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Defendants maintain their corporate headquarters in this District and certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District.

14. In connection with the acts and conduct alleged in this Complaint, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

15.    By the Court's March 12, 2014 Order [Dkt. No. 66], the Retirement System was appointed Lead Plaintiff in this action.  Lead Plaintiff purchased General Cable common stock during the Class Period and as a result of defendants' alleged misconduct, suffered damage in connection with the purchase of General Cable stock.  A copy of the certificate evidencing Lead Plaintiff's purchase was filed in connection with the motion to be appointed Lead Plaintiff [Dkt. No. 15].

16.    Defendant General Cable manufactures and markets copper, aluminum, and fiber optic wire and other cable products around the world.  The Company's operating structure – and the basis for its financial reporting – is segmented into three geographic regions: North America, Europe and Mediterranean, and ROW.   The Company's principal executive offices are located at 4 Tesseneer Drive, Highland Heights, Kentucky 41076-9753.  General Cable's common stock was widely traded on the New York Stock Exchange ("NYSE") during the Class Period under the ticker symbol BGC.

17.    Defendant Gregory B. Kenny has served as President and CEO of General Cable since August 2001.  He previously held the positions of President and Chief Operating Officer ("COO") from May 1999 through August 2001.  Additionally, Mr. Kenny held a number of senior management positions at General Cable and its immediate predecessor company since 1994.  Mr. Kenny has also been a member of the Board of Directors since 1997.  During the Class Period, Kenny signed General Cable's Securities and Exchange Commission ("SEC") reports, as well as the accompanying Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications.  Kenny resides in Hamilton County, Ohio.

- 5 -

18.     Defendant Brian J. Robinson served as General Cable's CFO, Treasurer and Executive Vice President since January 1, 2008.  In 2007, Robinson was a Senior Vice President while also holding the positions of CFO and Treasurer.  Before that service, Robinson was the Assistant Controller and then Controller for General Cable from 1999 through 2006.  Robinson came to General Cable from Deloitte & Touche LLP ("Deloitte"), where he had roles of increasing responsibility in the Cincinnati, Ohio office, and ended his tenure in London, England as Audit Manager providing accounting services to global companies.  During the Class Period Robinson signed General Cable's SEC reports as well as the accompanying Sarbanes-Oxley certifications. Robinson resides in Clermont County, Ohio.

19.     Defendants Kenny and Robinson are referred to herein as the "Individual Defendants."

20.     During the Class Period, the Individual Defendants, as senior executive officers, had direct access to confidential and proprietary information including material adverse nonpublic information concerning General Cable, its operations (including ROW international operations), finances and financial condition.  By reason of their positions within the Company, the Individual Defendants obtained this access by way of internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via the reports, presentations and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants, by reason of their positions within the Company, also controlled and possessed the authority to control the contents of General Cable's quarterly and

- 6 -

annual reports and other public filings, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, through the Individual Defendants' involvement in drafting, producing and reviewing of these misleading statements they had the opportunity to commit and permit the fraudulent acts alleged.

22.     Additionally, the Individual Defendants, by reason of their high-level positions with General Cable, directly participated in the Company's management and were directly involved in General Cable's day-to-day operations.  Accordingly, the Individual Defendants were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of General Cable's business and financial reporting.

23.     As senior executive officers and controlling persons of a publicly traded company, the common stock  of which was and is registered with the SEC pursuant to the 1934 Act, and was and is traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information regarding General Cable's operations, business, financial statements, and financial metrics, such as earnings and net income, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of General Cable common stock would be based upon truthful and accurate information.  The Individual Defendants' materially false statements and material omissions during the Class Period violated these specific requirements and obligations.

- 7 -

24.     The Individual Defendants are each liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of General Cable securities by knowingly concealing or consciously disregarding material adverse facts and thereby disseminating materially misleading statements.  The scheme: (i) deceived the investing public regarding General Cable's business, operations, financial performance and the intrinsic value of General Cable's common stock; and (ii) artificially inflated the price of General Cable's common stock.

## GENERAL CABLE'S FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND VIOLATED GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND SEC REQUIREMENTS

25.     General Cable's publicly issued financial statements for the fiscal quarters and years 2008 through 1Q13, and related earnings releases issued during the Class Period, were materially false and misleading in violation of Generally Accepted Accounting Principles ("GAAP")[2] because defendants:

(a)     improperly inflated operating income, net income and earnings per share ("EPS") by improperly recognizing premature, inflated, and fictitious revenue associated with "bill and hold" sales;

(b)     improperly understated cost of sales expenses, and overstated operating income, net income, EPS and inventory balances by improperly accounting for inventory and the related VAT assets in its Brazil subsidiary;

---

[2]     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. §210.10-01(a).

- 8 -

(c)    improperly understated cost of sales expense and overstated inventory, property, plant & equipment ("PP&E") and comprehensive income by improperly recording erroneous foreign currency adjustments in or related to its Canadian and Mexican subsidiaries; and

(d)    improperly accounted for numerous other transactions by understating various expense accounts while overstating related asset accounts by improperly delaying the reporting of expenses or other charges, including improper capitalization of costs, misuse of accruals and failure to record timely inventory shortfalls identified through physical inventory counts.

26.    Defendants admittedly engaged in the alleged accounting failures for over five years, that is, from no later than 2008 through 1Q13.  All of these accounting failures allowed the Company to boost its earnings artificially.

**The Defendants Improperly Recognized Revenue on "Bill and Hold" Sales**

27.    One of the methods General Cable used to inflate its consolidated net income, EPS, and the ROW segment's operating income was by employing an accounting scheme known as the "bill and hold."  Bill and hold refers to product sales in which revenue is recognized on the seller's books, even though the seller "holds" and does not ship the goods to the buyer until a later time, as directed by the buyer.  As part of its second restatement, General Cable admitted that its financial results included improperly recognized revenue from bill and hold transactions with aerial transmission cable customers in Brazil, in violation of GAAP.

28.    GAAP, specifically the SEC's Staff Accounting Bulletin No. 104 ("SAB 104"), and its predecessor SEC Staff Accounting Bulletin No. 101 ("SAB 101"), *Revenue Recognition,* requires that before a sale can be recognized as income in a public company's financial statements, the

product generally must be shipped to the customer, or services must be rendered.[3]  Because the SEC believes "bill and hold" sales typically do not meet this standard, the SEC in 1999 issued SAB 101, setting forth 12 very specific and stringent criteria that **all** have to be met in order to recognize revenue on such transactions. SAB 101 and its successor SAB 104 are well established, widely known, and considered **the** primary U.S. GAAP governing revenue recognition for all domestic publicly reporting companies.  Four of the 12 criteria that must be met before recognizing a "bill and hold" transaction as revenue include: (i) the risks of ownership must have passed to the buyer; (ii) there must be a fixed schedule for delivery of the goods for which the date for delivery must be reasonable and must be consistent with the buyer's business purpose; (iii) the ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and (iv) the products are ready for shipment.

29.     In its October 15, 2013 Form 8-K report and its restated Form 10-K/A reports for 2011 and 2012, General Cable announced that it would cease bill and hold accounting in Brazil beginning 3Q13, and would only recognize future Brazil revenue upon shipment because the Company did not meet the SEC's bill and hold criteria.  In fact, the Company's purported bill and hold sales failed to meet at least the four criteria above, as General Cable later admitted in its FY2011 and 2012 Form 10-K/A reports that it failed to segregate the supposedly sold inventory for aerial cable customers, cannibalized portions of the inventory it did segregate to fill other unrelated

---

[3]     FASB Statement of Financial Accounting Concepts No. 5 ("FASCON 5") clearly and concisely states that revenue should not be recognized until it is both realized (or realizable) and earned.  SAB 104 has further reiterated revenue recognition rules under GAAP by requiring that revenue can be recognized only when all of the following criteria are met:

1. Persuasive evidence of an arrangement exists,
2. Delivery has occurred or services have been rendered,
3. The seller's price to the buyer is fixed or determinable, and
4. Collectability is reasonably assured.

- 10 -

orders, and the products "sold" were not ready for shipment. Additionally, because the purportedly sold inventory was either not put aside, was used for other customer orders, or was not ready to ship, the risk of ownership could not have legitimately passed to the buyer. It should be noted that General Cable could have simply deferred recognition of the revenue until the period in which it actually delivered the products, as it belatedly began doing after admitting in 2013 that its previous practice was improper. By employing the bill and hold scheme, however, the Company was able to accelerate improperly the revenue recognized on many of these transactions into earlier accounting periods.

30. According to CW3,[4] defendant Robinson was completely aware the ROW region was employing bill and hold revenue recognition in Brazil because Robinson had to personally approve each bill and hold sale in Brazil. CW3 was even copied on the approval emails. As the CFO, and because Robinson was involved in approving the improper Brazilian bill and hold sales, he would have known that these sales constituted significant amounts of the ROW's net sales, and General Cable's operating income and net income.

31. Because bill and hold sales are red flags to the SEC, analysts and investors, General Cable also did not disclose in the Company's Class Period financial statements that it recognized revenue on "bill and hold" sales and that these purported sales transactions were material. For example, improper Brazil bill and hold transactions alone constituted 13% of General Cable's consolidated net income and EPS for 2011, and 18% of the ROW's disclosed operating income in 2011.

---

[4]   Through the investigation of this case, a number of former employees were interviewed and provided information confidentially. They are referred to as Confidential Witnesses or "CWs." CW3 worked for General Cable as the Senior Vice President, Latin America from 2007 to 2013 and previously for PDIC in 1990. CW3 worked in Brazil in 2008 and 2009 and thereafter in the United States. CW3 was responsible for supervising budgets in the Latin American units and ensuring they met corporate financial objectives, including cost objectives.

**Defendants Failed to Take Charges for Missing Inventory, Related Tax Assets, and Inventory Accounting Errors in Violation of GAAP**

32.     Defendants improperly overstated net income, EPS, inventory and receivable balances in General Cable's financial statements for the fiscal years ended 2007 through 2011, and the first two quarters of 2012, by improperly failing to write-off missing inventory and related VAT assets in its Brazilian subsidiary. This is not in dispute. General Cable disclosed it lost significant amounts of copper inventory due to theft from its Brazilian facilities before and during the Class Period.

33.     Pursuant to GAAP, inventory must be valued at the lower of cost or market. If the value of inventory is diminished by causes such as theft, damage or other circumstances, a loss must be reflected by a charge against the income in the period in which the loss occurs, to write-down the inventory to its actual cost or market price, whichever is lower. *See* FASB Accounting Standards Codification ("ASC") 330-10-35, *Inventory*.

34.     Defendants knew or were reckless in not knowing that an inventory write-off in ROW was required in each quarter during the Class Period, as accounting personnel within the Company's ROW segment had noticed that several physical inventory counts did not match the detailed underlying Brazilian subsidiary's inventory accounting records. These accounting records, in turn, did not match the master inventory account balance in the General Ledger with increasing frequency during the Class Period. It was also plainly known in the Brazilian subsidiary that the detailed perpetual inventory module in the Brazil accounting system was improperly decoupled so that it did not automatically update the General Ledger. At the end of an accounting period, it is a fundamental accounting procedure to compare the inventory subledger's final balance to the inventory account balance in the General Ledger, reconcile any difference, and make the necessary adjustments to the General Ledger. Rather than properly reconciling the underlying inventory records and correcting

- 12 -

the overstated inventory balance in the General Ledger by a charge against income in the quarter the inventory loss occurred, General Cable kept delaying the reconciliation and write-off throughout the Class Period.  Accordingly, a delayed write-off would result in a materially negative effect on General Cable's consolidated net income and earnings.  The Individual Defendants knew, or were reckless in not knowing, that this delay had no legitimate accounting basis and was used improperly to inflate General Cable's earnings.  Consequently, General Cable's failure to write down ROW inventory properly was intentional, and could not plausibly have been an innocent mistake or mere error because accounting personnel knew or recklessly disregarded that the underlying detail inventory records could not and did not support the inflated inventory balance in the Company's General Ledger.

35.     This fundamental inventory write-down, however, was not the only charge related to the missing inventory that the Company was required to take during the Class Period, but did not.  In its second restatement, announced on October 15, 2013, General Cable disclosed it was also restating its public financial statements to correct its improper accounting for the VAT assets associated with the missing Brazilian inventory.  When General Cable bought raw material in Brazil, it paid VAT to the supplier, which the Company would later recoup when it sold its finished products.  Because the stolen inventory no longer existed, the associated inventory VAT benefit/refund could not be recovered.  Notwithstanding the failure to write off properly the unrecoverable Brazilian VAT assets associated with missing inventory in the same period the inventory count discrepancy or missing inventory was discovered, General Cable again failed to correct this improper accounting on a timely basis.  The Company failed to write off the unrecoverable Brazilian VAT assets as part of the first restatement announced October 29, 2012 – when the related Brazilian inventory accounting was first restated.  The failure to correct the VAT asset accounting in the same restatement as the Brazilian

- 13 -

inventory correction demonstrates management's remarkable lack of oversight and engagement in basic accounting and internal control issues, even during the first restatement process.

36.     As a result of General Cable's improper accounting for its Brazilian inventory and associated VAT, the Company improperly inflated its net income and EPS reported during the Class Period by 51%, 19%, 39% and 37% for the years ended 2009, 2010, 2011 and 2012, respectively, all in violation of GAAP.

**General Cable Improperly Accounted for Foreign Currency Reserves**

37.     General Cable also improperly accounted for foreign currency translation adjustments related to transactions between the Company and its Canadian subsidiaries, and in its Mexican subsidiary.  General Cable presents its financial statements in U.S. dollars.  However, because it is a global company with many foreign subsidiaries, General Cable must make translation adjustments to translate financial transactions and financial statements of its subsidiaries denominated in a foreign currency to U.S. dollars.  GAAP, specifically ASC 830, *Foreign Currency Matters* mandates this translation.  This is nothing new for the Company, as it has had foreign subsidiaries for many years and has years of experience translating transactions and financial statements from foreign currencies into its reporting currency, the U.S. dollar.

38.     From 2009 through at least 2011, however, General Cable admitted in its FY2011 Form 10-K/A restatement report that it made "***erroneous*** foreign currency adjustments that it would correct through its restatement, related to inventory and property, plant and equipment ("PP&E") in its Mexican subsidiary."  These "errors" inflated inventory and inflated PP&E (in 2010 and 2011 by $3.1 million and $5 million respectively), and understated the true cost of sales expense in 2009 by $8.1 million, in violation of ASC 830.  Additionally, the Company improperly recorded foreign currency adjustments related to certain transactions with its Canadian subsidiary that inflated

- 14 -

accumulated other comprehensive income by $6.5 million in 2010 and 2011, again in violation of ASC 830.

**Defendants' Other Accounting Misstatements Also Artificially Increased Earnings**

39.      In addition to the above misstatements that allowed the defendants to artificially and materially inflate net income and earnings throughout the Class Period, as part of the second restatement, the Company also disclosed additional, purportedly "immaterial" restatement adjustments that served to artificially and improperly boost net income.  While General Cable contends that these additional "errors" were immaterial, it is telling that each of the "immaterial errors" disclosed in the second restatement either boosted net income and EPS or had no effect at all.  Said differently, the effect of each of these originally improper accounting "errors" only went one way – they all either improved net income or did not affect it.  It is implausible that each of so many "errors," over so many years, all had the effect of increasing, not reducing net income and earnings to the Company's benefit.  The Company has admitted in its second restatement that these purportedly immaterial errors violated GAAP, and included:

(a)      General Cable's failure to adjust receivable allowances properly in 2010 through 2012, which served to inflate improperly receivables by $2.1 million in each year, as well as inflating the Company's operating income and net income in those years by the same amount, before adjustment for taxes;

(b)      The Spanish subsidiary improperly failed to record a valuation allowance against a tax asset, improperly understating income tax expense by $3.5 million during FY2012;

(c)      Philippine subsidiaries improperly under-recorded depreciation expense, overstating PP&E and inflating cost of sales by $.6 million, $.6 million and $.5 million in FY2012, FY2011 and FY2010, respectively; and

- 15 -

(d)     The Thailand subsidiary improperly capitalized costs as property and equipment that should have been expensed instead, inflating net income and EPS during the Class Period by $1.2 million.

**General Cable's Restatements**

40.     On October 29, 2012 General Cable surprised investors when it admitted that its previously filed public financial statements for the past five and a half years (22 successive quarterly and annual public financial statement reports) contained material accounting errors, should no longer be relied upon, and its past 14 successive publicly filed financial statements covering the quarters and years ended during 2009, 2010, 2011 and the first two quarters of 2012 would have to be restated:

### Restatement of Consolidated Financial Statements

On October 29, 2012, General Cable Corporation (the "Company") announced that it had identified historical accounting errors relating to inventory. The accounting errors understated cost of sales and overstated inventory balances in its previously issued financial statements for the years ended December 31, 2011, 2010, 2009, 2008 and 2007, for the interim periods during those years, for the three months ended March 30, 2012 and for the six months ended June 29, 2012.

\*        \*        \*

The Audit Committee concluded on October 26, 2012 that the Company's previously issued consolidated financial statements for fiscal years ended December 31, 2011, 2010, and 2009 and the related reports of its independent registered public accounting firm, the interim periods during those years, and the financial statements as of and for the periods ended March 30, 2012 and June 29, 2012 ***should no longer be relied upon***.  After analyzing the size and timing of the inventory accounting issue, ***the Company determined the inventory accounting errors were material and would require the Company to restate certain of its previously issued financial statements***.  For the years ended December 31, 2011, 2010, 2009, and 2008, and for the three months ended March 30, 2012 and six months ended June 29, 2012, cost of sales was understated by $17.9 million, $8.3 million, $5.6 million, $7.1 million, $2.7 million and $6.2 million, respectively. As of December 31, 2011, 2010, 2009 and 2008, March 30, 2012 and June 29, 2012 inventory balances were overstated by $40.0 million, $27.0 million, $17.4 million, $8.7 million, $43.7 million, and $43.5 million, respectively.

- 16 -

Exhibit 1 (Excerpt of General Cable 2011 Form 10-K/A No. 1) at pg. 3.

41.    Despite this breathtaking admission, General Cable did not come close to disclosing

the extent of its previous accounting failings.  Approximately a year later, General Cable disclosed

that even its freshly restated and "corrected" public financial statements from 2008 through the 2Q12

could *again* no longer be relied upon due to completely different accounting irregularities.  General

Cable acknowledged it would restate the same previously amended financial statements a second

time, this time adding the previously filed quarterly public financial statements for the remainder of

2012, the year ended 2012, and 1Q13:

> On October 10, 2013, the Audit Committee of the Board of Directors of the
> Company, upon the recommendation of the Company's executive officers, concluded
> that due to certain accounting errors, in the aggregate, related to (i) revenue
> recognition in connection with historical "bill and hold" transactions for aerial
> transmission projects in Brazil and (ii) VAT assets, ***the Company's previously issued***
> ***consolidated financial statements for the fiscal years 2008 through 2012 and the***
> ***interim periods during those years, and the interim financial statements as of, and***
> ***for, the three fiscal months ended March 29, 2013 should no longer be relied upon***
> ***and the Company corrected these errors within the accompanying restated***
> ***consolidated financial statements***.  In addition, the Company corrected other
> immaterial errors within the accompanying restated consolidated financial statements
> (the "Other Immaterial Adjustments").  ***The consolidated financial statements***
> ***restatement for the bill and hold, VAT and Other Immaterial Adjustments is***
> ***referred to as "Restatement No. 2***."

*See also* Exhibit 2 (Excerpt of General Cable 2012 Form 10-K/A No. 1).

**General Cable's Financial Restatements Were Material**

42.    As noted above, General Cable has admitted that its financial statements were

materially misstated.  The materiality of these misstatements is further demonstrated by the

enormous effect the misstatements had on General Cable's originally reported net income, EPS and

operating income during the Class Period, as shown in the following table.  Notably, from 2009

through 2011, General Cable's improper accounting practices, materially inflated the Company's

reported net income by 51.75%, 23.13% and 53.76%, its EPS by 50.7%, 23.58% and 59.92%, and its

operating income by 10%, 7% and 15.6% for the fiscal years ended 2009, 2010 and 2011, respectively.[5]  The restatements' effect of only slightly improving 2012 net income and operating income by 7.5% and 2.3%, respectively, is a consequence of a portion of the prematurely and improperly recorded bill and hold sales reversed out of earlier years, finally meeting the required revenue recognition criteria in 2012.

---

[5]    While the accompanying misstatement table only includes 2009 through 2012, the Company has admitted in its FY2011 and FY2012 Form 10-K/A reports that its improper accounting also impacted the 2007 and 2008 annual and quarterly financial statements, and that the financial statements for those periods also should no longer be relied upon.  Restatement of those years' and quarters' reports was presumably not done by General Cable, as registrants generally amend only the most recent Form 10-K report, including all three years' data contained therein.

940903_1

## Summary of General Cable Corp. Key Financial Statement Misstatements
## Annual Results
### (In millions except Earnings per share)

|  | Net Income attributable to common Shareholders | Earnings per share (Diluted) | Operating Income |
|---|---|---|---|
| **Year Ended 12/31/2009** |  |  |  |
| Originally Reported | $  56.30 | $  1.07 | $  179.90 |
| As Restated 1st time | 39.50 | 0.75 | 166.20 |
| Amount Overstated | 16.80 | 0.32 | 13.70 |
| % Overstatement caused by restatement no. 1 errors | **45.28%** | **45.07%** | **8.38%** |
| As Restated 2nd time | 37.10 | 0.71 | 163.50 |
| Amount Overstated | 2.40 | 0.04 | 2.70 |
| % Overstatement caused by restatement no. 2 errors | **6.47%** | **5.63%** | **1.65%** |
| **Total Percentage Overstated** | **51.75%** | **50.70%** | **10.03%** |
|  |  |  |  |
| **Year Ended 12/31/2010** |  |  |  |
| Originally Reported | 69.20 | 1.31 | 222.40 |
| As Restated 1st time | 61.40 | 1.16 | 214.10 |
| Amount Overstated | 7.80 | 0.15 | 8.30 |
| % Overstatement caused by restatement no. 1 errors | **13.88%** | **14.15%** | **3.99%** |
| As Restated 2nd time | 56.20 | 1.06 | 207.80 |
| Amount Overstated | 5.20 | 0.10 | 6.30 |
| % Overstatement caused by restatement no. 2 errors | **9.25%** | **9.43%** | **3.03%** |
| **Total Percentage Overstated** | **23.13%** | **23.58%** | **7.03%** |
|  |  |  |  |
| **Year Ended 12/31/2011** |  |  |  |
| Originally Reported | 83.80 | 1.57 | 248.00 |
| As Restated 1st time | 65.70 | 1.23 | 230.10 |
| Amount Overstated | 18.10 | 0.34 | 17.90 |
| % Overstatement caused by restatement no. 1 errors | **33.21%** | **33.33%** | **8.34%** |
| As Restated 2nd time | 54.50 | 1.02 | 214.60 |
| Amount Over/(Under)stated | 11.20 | 0.21 | 15.50 |
| % Overstatement caused by restatement no. 2 errors | **20.55%** | **20.59%** | **7.22%** |
| **Total Percentage Overstated** | **53.76%** | **53.92%** | **15.56%** |
|  |  |  |  |
| **Year Ended 12/31/2012** |  |  |  |
| Originally Reported | 3.70 | 0.08 | 194.80 |
| As Restated | 4.00 | 0.08 | 199.40 |
| Amount Understated | (0.30) | 0.00 | (4.60) |
| **Total Percentage Understated** | **(7.50%)** | **0.00%** | **(2.31%)** |

43.     The impact of the restatements of General Cable's admitted accounting errors to each of the interim quarters in 2010, 2011, 2012 and 1Q13 are also material to net income and EPS, in almost every quarter with overstatements of net income and EPS as high as 250%.  *See* Exhibit 3 (General Cable's key financial misstatements on a quarterly basis).

**The Circumstances of General Cable's Restatements Further Evidence Scienter**

44.     A restatement of previously issued public financial statements is a serious, significant and portentous event.  The accounting rules governing correction of errors or fraud in previously issued financial statements do not allow a company any discretion or election in deciding whether or not to retroactively restate its previously issued financial statements.  GAAP only permits – and requires – restatements of previously issued financial statements to correct ***material*** errors, resulting from either: (a) "mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared"; or (b) a change in accounting principle or a change in the reporting entity.  *See* ASC 250-10-45-1 to 45-24, *Accounting Changes and Error Corrections*.  Here, General Cable has admitted that its restatement solely corrected "errors," and did not change accounting principles or the reporting entity.  Therefore, General Cable's restatement of its previous financial statements admits that: (i) the Company's financial results issued during the Class Period and all public statements regarding those results were materially false; and (ii) the financial results reported during the Class Period were incorrect based on information available to the defendants at the time the results were reported.

45.     Accordingly, General Cable's multiple accounting period restatements necessarily admit that: (i) its financial statements originally issued before and during the Class Period and defendants' related public statements were materially false and (ii) the Class Period financial results were ***incorrect based on information available to the defendants when the results were originally***

- 20 -

*reported*.  Additionally, General Cable's announced restatements, as described herein, contain, at minimum, the following indicators of defendants' scienter.

**The Type of Restatements (General Cable's "Misuse of the Facts")**

46.     Most if not all of the restated items were not simple mathematical errors or an honest misapplication of an accounting standard.  For example, the restatement of bill-and-hold revenue resulted from sales transactions directly structured to circumvent GAAP revenue recognition criteria. This was done to record premature and inflated revenues on sales that otherwise would have resulted in delayed, decreased, or even no revenue.  Additionally, the failure to take a charge for the Brazilian inventory theft and to write off the VAT assets associated with the missing inventory that would no longer be available had the effect of increasing earnings.

**The Duration of the Improper Accounting**

47.     The restatements here do not hinge on an honest accounting mistake or a mere oversight during a single quarter or even a single year or two that were later corrected in good faith. General Cable admitted that its public financial statement reports for each of the years ended 2007, 2008, 2009, 2010, 2011, 2012, each included quarterly period report and its 1Q13 quarterly financial statement report were false.  General Cable also acknowledged that most of these financial statements could not be relied upon and it would restate results for most of these years and quarters, not once, but twice.  This was done to correct the General Cable's accounting improprieties that could no longer be concealed.

48.     A recent study of restatements by publicly traded companies indicates that the average number of days covered by restatement was 510 in 2008, 496 in 2009 and 491 in 2010, according to a May 2011 report prepared by Audit Analytics, titled "2010 Financial Restatements: A Ten Year Comparison."  Here, in contrast, General Cable's restatements covered a period of five years, totaling at least 1,800 days.  Indeed, a recent Ernst & Young study estimated that

- 21 -

approximately 1% of companies issue restatements each year, demonstrating that General Cable's multiple restatements over a few years are an extreme anomaly. The extended duration of the internal control deficiencies, without correction and the recidivist nature of General Cable's multiple restatements demonstrates a knowing or reckless disregard for the Company's financial reporting obligations.

### The Magnitude of the Restatements

49.     The restatements were strikingly large and material. Overall, General Cable cumulatively overstated its FY2009 through FY2012 net income by $60.5 million, including annual net income overstatements of 15.75%, 23.13%, 53.76% and (7.5%) for the fiscal years ended 2009, 2010, 2011 and 2012, respectively.

50.     Additionally, the extended time period and the effort required to issue General Cable's restatements also demonstrates that the restatement was not the product of mere negligence and supports a finding of scienter. According to the Audit Analytics report, the average time a company required to issue a restatement following the initial disclosure was 16.80 days in 2008, 19.28 days in 2009 and 4.95 days in 2010. Here, General Cable has admitted that the Company's management became aware of the problem in September 2012. It subsequently publicly disclosed the existence of the problem on October 29, 2012. After issuing an initial restatement on March 1, 2013, General Cable was then forced to announce a second follow-on restatement. It did not address all accounting issues and advise investors that the material control weaknesses had been resolved until January 21, 2014. General Cable needed 449 days to finalize and issue its corrective restatement.

51.     The Company has also admitted that resolving the inventory problems and lack of controls presented an "extensive commitment of time and effort" and involved a "formidable task[],"

demonstrating the depth and magnitude of General Cable's improper financial practices.  In a November 7, 2012 Form NT 10-Q,[6] General Cable stated that:

> Despite the extensive commitment of time and effort by the Company's management and financial staff, as well as ongoing communications with, and review of information by, the Company's independent registered public accounting firm, the Company is unable to complete the formidable tasks described above within 40 days subsequent to the end of its fiscal quarter ended September 28, 2012.

52.     General Cable's difficulty in addressing its material control deficiencies and the extended time period required to do so demonstrates the significant ineffectiveness of the prior controls, and supports scienter.

### The Misstatements Served to Boost Net Income Artificially

53.     It is no coincidence that each of the accounting errors impacting net income and EPS benefited the Company.  These "errors" all increased net income and EPS – none of the improper accounting *decreased* net income or EPS when originally recorded.

### General Cable Failed to Institute and Maintain Adequate Internal Controls and Falsely Reported the Internal Controls' Effectiveness

54.     General Cable, like all SEC registrants, is required to maintain a system of internal accounting controls sufficient to reasonably assure that its transactions are recorded properly so that its public financial statements accord with GAAP.  *See* SEC's Staff Accounting Bulletin No. 99.  In defining what constitutes the required system of internal accounting control, and what it should accomplish, the SEC has ruled that a company's principal executive and financial officers (Kenny and Robinson in this case) are responsible for the design and the implementation of the system of internal control over financial reporting:

---

[6]     For publicly reporting companies, a Form 10-Q report must be filed within 45 days following a fiscal quarter's close.  A Form NT 10-Q report must be filed if a company cannot timely file its required quarterly report and must explain the reason for the delay.

The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(a)      Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(b)      *Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles*, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(c)      *Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements*.

*See* SEC Regulation S-X (17 C.F.R. §240.13f, controls and procedures).

55.      Defendants Kenny and Robinson do not dispute that they were indeed responsible for establishing and maintaining effective internal controls over financial reporting and disclosures at General Cable, as they each disclosed the following in their signed certifications included with each of the Company's annual and quarterly SEC filings on Form 10-K, 10-K/A, 10-Q and 10-Q/A reports before and during the Class Period:

*The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting* (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have . . . .

56.      As noted herein, however, the Company has belatedly admitted in its 2012 Form 10-K/A No. 1 report in October 29, 2012 that it did not maintain effective internal controls over financial reporting and disclosure during 2009 through 2012, and that the resulting internal control deficiencies were so profound they constituted a "material weaknesses in internal control over financial reporting" within the meaning of the Public Company Accounting Oversight Board's

- 24 -

("PCAOB") Auditing Standard No. 5.  *See also* Exhibit 2 (Excerpt of General Cable 2012 Form 10-K/A).

57.     General Cable's admission that its internal control deficiencies constituted a "material weakness" is a serious and meaningful event.  The PCAOB defines a material weakness as a "deficiency, or a combination of deficiencies in internal control over financial reporting such that there is a ***reasonably possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis***."  This is exactly what happened at General Cable, and it led to the pervasive accounting irregularities over five and a half years, and the restatement of the Company's consecutive public financial statements from 2009 through 1Q13.

**The Individual Defendants Knew or Disregarded that the
Sarbanes-Oxley Certifications They Signed Were False**

58.     As part of their responsibilities, defendants Kenny and Robinson each signed Sarbanes-Oxley certifications for each annual and interim filing on Forms 10-K, 10-K/A, 10-Q and 10-Q/A issued during the Class Period.  Therein, they each separately: (1) acknowledged they were responsible for establishing and maintaining internal controls; (2) certified that they had performed evaluations of General Cable's disclosure controls and internal controls over financial reporting; and (3) certified the effectiveness of General Cable's disclosure controls and internal controls over financial reporting as a result of their evaluations.

59.     These certifications for 1Q08, 2Q08, 3Q08, FY2008, 1Q09, 2Q09, 3Q09, FY2009, 1Q10, 2Q10, 3Q10, FY2010, 1Q11, 2Q11, 3Q11, FY2011, 1Q12, 2Q12, 3Q12, FY2012, and 1Q13 were false, however, because: (1) the defendants knew or were reckless in not knowing that General Cable's financial reporting materially overstated General Cable's net income and EPS; (2) defendants knew or were reckless in not knowing that General Cable's financial reporting did not

- 25 -

comply with GAAP; (3) defendants knew or were reckless in not knowing that General Cable's internal controls were inadequate and ineffective in that General Cable failed to comply with Committee of Sponsoring Organizations of Treadway Commission ("COSO")[7] requirements; and (4) General Cable's Form 10-Q/10-K reports for the years ended 2009 through 2012 and the quarter ended 1Q13, did not comply with Rule 13a-15f's requirement that the "issuer's management must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter."

**Defendants Purported Assessment of the Design and Effectiveness of Internal Controls Would Have Detected the Truth**

60.    The SEC provides the following rules for management to follow in performing its required assessment of the effectiveness of a company's internal controls over financial reporting:[8]

(a)    Management's assessment of a company's internal controls over financial reporting must be based on procedures sufficient both to evaluate its design and to test its operating effectiveness. ***Controls subject to such assessment include***, but are not limited to:

(i)    Controls over initiating, recording, processing and ***reconciling account balances***, classes of transactions and disclosure and related assertions included in the financial statements;

(ii)    Controls related to the initiation and ***processing of non-routine and non-systematic transactions***;

---

[7]    To gauge a company's internal control effectiveness, the 1934 Act requires a registrant's management to certify that they compare the registrant's internal control effectiveness, to an established model standard for effectiveness.  The COSO internal framework has been widely accepted as the established common internal control model against which virtually all SEC registrants assess their internal control systems against.

[8]    SEC Release Nos. 33-8238; 34-47986 Final Rule: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Part II.B.d: *Method of Evaluating*.

- 26 -

(iii)    Controls related to the selection and application of appropriate accounting policies; and

(iv)    Controls related to the prevention, identification and detection of fraud.

61.    However, the SEC mandated assessment of the design and effectiveness of each one of these controls above, if properly carried out by Kenny and Robinson during each of FYs 2007, 2008, 2009, 2010 and 2011 as required, either would have alerted or did alert defendants to the very internal control deficiencies and accounting problems they later claim caused the restatement of the Company's 2009, 2010, 2011 and 1Q12 and 2Q12 financial results.  For example:

(a)    Assessment of (i) above: "Controls over initiating, recording, processing and *reconciling account balances*," would have alerted or did alert the Individual Defendants that inventory account balances in the General Ledger in Brazil were not being reconciled and correctly adjusted years earlier than the Company belatedly disclosed in its amended 2011 Form 10-K/A report:

> Processes and control activities designed to support and *reconcile inventory general ledger entries* were not effective, were incorrectly applied or were overridden. . . . *[R]econciliation of inventory values to the general ledger balances was not performed*.

(b)    Assessment of (ii) above: "Controls related to the initiation and processing of *non-routine and non-systematic [manual] transactions*," would have alerted or did alert the Individual Defendants that ROW accountants were making irregular, manual entries to the accounting systems years earlier than the Company belatedly disclosed in the Company's amended 2012 Form 10-K/A report:

> [T]he inventory module in the Brazil IT systems was improperly decoupled so that it did not automatically update the general ledger, thereby *enabling the cost accounting manager to more freely enter manual adjustments* in the general ledger, which furthered the theft conspiracy . . . . It appears that the Brazilian *cost accounting manager was able to make numerous manual entries in the general ledger without required documentation and approval*; in other instances, cost

- 27 -

analysts, at the cost accounting manager's instruction, **made manual entries to the general ledger**, which the cost accounting manager then approved."

(c)     Assessment of (iii) above: "Controls related to the selection and application of appropriate accounting policies" would have alerted or did alert the Individual Defendants that the Company was inappropriately applying "bill and hold" revenue recognition accounting policies in ROW, as the Company eventually disclosed in its amended 2012 10-K/A report:

> "management concluded that the inventory controls in Brazil were inadequate to detect activity that would cause the Company to fail to meet all of the conditions for revenue recognition in bill and hold transactions.

(d)     Assessment of the (iv) above: "**Controls related to the prevention, identification, and detection of fraud,**" would have identified the deficient controls that allowed the fraudulent accounting in items (i)-(iii) above, as well as other deficiencies that the Company belatedly disclosed in its amended 2012 Form 10-K/A report:

> Brazilian cost accounting manager and cost analysts, who the Company believes exploited their access and colluded to facilitate theft of substantial quantities of copper and **fraudulent adjustments** to the systems. . . . Physical security controls to protect assets at one of the Brazilian facilities were not sufficient to prevent theft.

62.     Accordingly, the defendants' "**review**" of General Cable's financial statements, "**evaluation**" of the Company's disclosure controls, and "**evaluation**" of the Company's internal control over financial reporting that the defendants certified they had personally performed in their Sarbanes-Oxley certifications, would clearly have alerted the defendants to the failure of and their deficiencies in the internal controls over said transactions.  Therefore, the defendants either knew of the misstatements in General Cable's financial reports and disclosures, the ineffectiveness of the disclosure controls, and the deficiencies in internal controls; or the defendants knowingly failed to carry out the required review of the financial reports and disclosures, evaluation of applicable internal controls, and evaluation of disclosure controls (as they stated they had done in their

certifications) and thus had no basis to make the affirmative certifications.  In either case, defendants

knew or recklessly disregarded that their Sarbanes-Oxley certifications were false.

**Defendants Falsely Stated How They Evaluated the Internal Controls**

63.     General Cable also falsely stated its FY2012 Form 10-K report that "the Company

conducted an evaluation of the effectiveness of internal control over financial reporting based on the

'Internal Control-Integrated Framework' issued by the Committee of Sponsoring Organizations of

the Treadway Commission (COSO)."  General Cable made nearly identical false assertions in its

FY2010 Form 10-K, 2011 Form 10-K/A Nos. 1 and 2, and 2012 Form 10-K and Form 10-K/A No. 1

reports.  In accordance with COSO guidance, the defendants were obligated – but failed – to comply

with essential components of COSO's framework.  Compliance with these components provides an

effective framework for describing and analyzing internal control system implementation in an

organization, as required by SEC financial regulations.  *See* Rule 15d-15 of the 1934 Act.  For

example, the 1992 COSO framework speaks directly to one of the major problems with General

Cable's internal control environment:

> Internal control consists of five interrelated components. These are derived
> from the way management runs a business, and are integrated with the management
> process. . . .  The components are:
>
>           *      *      *
>
> •  ***Information and Communication*** – Pertinent information must be identified,
> captured and communicated in a form and timeframe that enable people to carry out
> their responsibilities. . . .  ***Effective communication also must occur in a broader
> sense, flowing down, across and up the organization.  All personnel must receive a
> clear message from top management that control responsibilities must be taken
> seriously***.  They must understand their own role in the internal control system, as
> well as how individual activities relate to the work of others.  ***They must have a
> means of communicating significant information upstream***.

Internal Control Integrated Framework, Committee of Sponsoring Organization of the Treadway

Commission, May 1994 at pgs. 4-5.

- 29 -

64.     However, contrary to this COSO guidance in existence since at least 1994, defendants acquiesced when faced with recalcitrant ROW upper management that resisted the corporate controller's attempts to obtain information and communicate with ROW personnel, rather than insisting on open communications "flowing down, across and up the organization."  In 1994, the COSO framework even provided a specific example of the problems that can arise when the information flow is restricted.  This example below, included in the COSO framework since 1994, closely parallels General Cable's internal control deficiency regarding the lack of inventory account reconciliation to the General Ledger in Brazil:

> In addition, specific duties must be made clear.  Each individual needs to understand the relevant aspects of the internal control system, how they work and his or her role and responsibility in the system.  Without this understanding, problems are likely to arise.  In one company, *for example, unit heads were required to sign a monthly report affirming that specified reconciliations had been performed. Each month, the reports were dutifully signed and submitted. Later, however, after serious problems were uncovered, it was discovered that at least two unit heads did not know what was really expected of them*.  One believed the reconciliation was complete when the amount of the difference between the two figures was merely identified.  Another took the reconciliation process only one step further, believing that its objective was satisfied when each individual reconciling item was identified.  In fact, the intended process was not complete until the reasons for the differences were pinpointed and appropriate corrective action was taken.

Internal Control Integrated Framework, Committee of Sponsoring Organization of the Treadway Commission, May 1994 at 63.

65.     Had the Individual Defendants properly used the COSO framework as they claimed, they would have known about the accounting errors alleged herein on a timely basis before or during the Class Period.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING THEIR FINANCIAL REPORTING AND GENERAL CABLE'S INTERNAL CONTROLS

66.     **False Statement**: On November 3, 2010, the Class Period's beginning, defendants issued a *Business Wire* press release announcing General Cable's 3Q10 financial results for the

- 30 -

period ended October 1, 2010.  The Company reported net income of $18.1 million, diluted EPS of $0.34, and operating income of $42.1 million.

67.    **False Statement**: On November 4, 2010, defendants hosted a conference call with investors and analysts to discuss General Cable's 3Q10 financial results and the Company's business.  The call repeated and addressed the financial information defendants previously made public on November 3, 2010.  During the conference, defendant Kenny announced: "I'm very pleased to report a ***solid third quarter . . . we reported revenues of $1.2 billion, and adjusted earnings per share of $0.54, both of which are at the upper end of our expectations***."

68.    **False Statement**: On October 29, 2010, defendants filed General Cable's 3Q10 Form 10-Q report for the period ended October 1, 2010 with the SEC.  The Form 10-Q report detailed General Cable's 3Q10 financial results and incorporated directly or by reference financial results from previous fiscal periods.  Kenny signed and Kenny and Robinson, respectively, certified the Form 10-Q report, as required by the Sarbanes-Oxley as follows:

1)    I have reviewed this Form 10-Q of General Cable Corporation;

2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

(a)    Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the

- 31 -

registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and;

5)   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

69.   **False Statement**: On February 8, 2011, defendants issued a press release reporting the Company's 4Q10 and FY2010 financial results.  General Cable reported 4Q10 net income of $35.0 million, diluted EPS of $0.66, and operating income of $63.2 million for the period ended December 31, 2010. The Company also reported net income of $69.2 million, diluted EPS of $1.31, and operating income of $222.4 million for the entire FY2010.

- 32 -

70.     **False Statement**: On February 9, 2011, defendants hosted a conference call with investors and analysts during which defendants Kenny and Robinson repeated and reaffirmed General Cable's 4Q10 and FY2010 financial results: "***For the fourth quarter of [2010], we reported revenues of $1.36 billion, and adjusted earnings per share of $0.75, both of which were above our expectations***."

71.     **False Statement**: On February 25, 2011, General Cable filed its annual Form 10-K report for FY2010.  Defendant Kenny signed the Form 10-K report, which incorporated directly or by reference financial results from previous periods.  Both Kenny and Robinson certified the financial results in purported conformance with Sarbanes-Oxley.  They asserted they had personally reviewed the Form 10-K report and that the public filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this [Form 10-K] report, fairly present in all material respects the financial condition, results of operations and cash flows of [General Cable] as of, and for, the periods presented in this report."

72.     **False Statement**: On May 2, 2011, General Cable issued a *Business Wire* press release announcing its 1Q11 financial results for the period ended April 1, 2011.  The Company reported net income of $38.2 million, diluted EPS of $0.70, and operating income of $73.1 million.

73.     Thereafter General Cable's stock price reached a Class Period-high of $47.90 per share.

74.     **False Statement**: On May 3, 2011, defendants hosted a conference call with investors and analysts to discuss General Cable's financial results and the Company's business.  Kenny and Robinson repeated and addressed the financial information previously made public on May 2, 2011.

During the conference, defendant Kenny declared: "I'm pleased to report a very strong start to the year continuing to build on several quarters of positive momentum. ***For the first quarter of 2011, we reported revenues of $1.45 billion, which was consistent with managements' expectation, and adjusted earnings per share of $0.79, which was well above our expectation. . . . In [ROW], we reported stronger operating results*** . . . ."  Robinson, in turn, reiterated many of the details of General Cable's 1Q11 financial performance: "***Operating income in the first quarter increased 16%, or $9.9 million, to $73.1 million compared to $63.2 million in the fourth quarter of 2010*** . . . . ***[U]neven but better overall performance in our [ROW] segment contributed to these stronger results***, led by strength in the Central America, Andean, Southeast Asia and African regions."

75.    **False Statement**: On May 6, 2011, defendants filed General Cable's 1Q11 Form 10-Q report with the SEC.  The Form 10-Q report detailed General Cable's 1Q11 financial results and incorporated directly or by reference financial results from previous fiscal periods.  Kenny signed the Form 10-Q report and Kenny and Robinson signed Sarbanes-Oxley certifications substantially similar to those quoted above.

76.    **False Statement**: On August 1, 2011, defendants issued a General Cable press release announcing General Cable's 2Q11 financial results for the period ended July 1, 2011.  The Company reported net income of $37.5 million, diluted EPS of $0.68, and operating income of $79.8 million for 2Q11.

77.    **False Statement**: On August 2, 2011, defendants hosted a conference call with investors and analysts during which defendants Kenny and Robinson repeated and reaffirmed General Cable's 2Q11 financial results:

>    ***Our reported revenues of $1.53 billion were slightly below our earlier communication, principally as a result of sequentially flat global volume. Our reported adjusted earnings-per-share of $0.77, was within our range of expectation, as better operating results in North America and ROW helped to offset***

*the impact of $0.05 per share of foreign currency translation losses, as well as a slightly higher-than-expected effective tax rate, which was equivalent to about $0.02 of earnings per share*.

78.     **False Statement**: On August 4, 2011, defendants filed the Company's 2Q11 Form 10-Q report with the SEC.  The Form 10-Q detailed General Cable's 2Q11 financial results and incorporated directly or by reference financial results from previous fiscal periods.  Defendant Kenny signed the Form 10-Q report, and Kenny and Robinson signed Sarbanes-Oxley certifications substantially similar to those quoted above.

79.     **False Statement**: On October 31, 2011, defendants issued a press release announcing General Cable's 3Q11 financial results for the period ended September 30, 2011.  The Company reported net income of $3.6 million, diluted EPS of $0.07, and operating income of $63.4 million.

80.     **False Statement**: On November 1, 2011, defendants hosted a conference call with investors and analysts to discuss General Cable's 3Q11 financial results and the Company's business.  During the call, defendants repeated and addressed the 3Q11 financial results, including revenues, net income, and earnings.

81.     **False Statement**: On November 3, 2011, defendants filed General Cable's 3Q11 Form 10-Q with the SEC.  The Form 10-Q detailed General Cable's financial results for 3Q11 and incorporated directly or by reference financial results from previous fiscal periods.  Defendant Robinson signed the Form 10-Q, and both Kenny and Robinson signed Sarbanes-Oxley certifications substantially similar to those quoted above.

82.     **False Statement**: On February 8, 2012, defendants issued a press release reporting the Company's 4Q11 and FY2011 financial results.  The Company reported net income of $4.4 million, diluted EPS of $0.09, and operating income of $31.7 million for the period ended December 31, 2011.  The Company also reported net income of $83.8 million, diluted EPS of $1.57, and operating income of $248.0 million for the entire FY2011.

- 35 -

83.    **False Statement**: On February 9, 2012, defendants hosted a conference call with investors and analysts to discuss General Cable's 4Q11 and FY2011 financial results and the Company's business.  During the conference, Kenny and Robinson repeated the financial results published in the Company's February 8, 2012 press release.

84.    **False Statement**: On February 23, 2012, General Cable filed with the SEC its FY2011 Form 10-K report for the period ended December 31, 2011.  Defendant Kenny signed the Form 10-K report, which included General Cable's previously reported 4Q11 and FY2011 financial results and incorporated directly or by reference financial results from previous fiscal periods.  Both Kenny and Robinson signed Sarbanes-Oxley certifications substantially similar to those quoted above.

85.    **False Statement**: On April 30, 2012, defendants issued a press release announcing General Cable's 1Q12 financial results for the period ending March 30, 2012.  The Company reported net income of $24.9 million, diluted EPS of $0.49, and operating earnings of $53.4 million.

86.    **False Statement**: On May 1, 2012, defendants hosted a conference call with investors and analysts to discuss General Cable's 1Q12 financial results and the Company's business.  Defendants Kenny and Robinson led the call and repeated and addressed the Company's 1Q12 financial results.

87.    **False Statement**: On May 4, 2012, defendants filed General Cable's 1Q12 Form 10-Q report with the SEC.  The Form 10-Q detailed General Cable's 1Q12 financial results and incorporated directly or by reference financial results from previous fiscal periods.   Defendant Robinson signed the Form 10-Q, and Kenny and Robinson signed Sarbanes-Oxley certifications substantially similar to those quoted above.

- 36 -

88.     **False Statement**: On July 30, 2012, defendants issued a press release reporting General Cable's 2Q12 financial results for the period ended June 29, 2012.  The Company reported net income of $21.8 million, diluted EPS of $0.43, and operating income of $72.6 million.  Kenny stated:

> *Aided by normal seasonal trends, we experienced broad-based improvement in a number of our businesses resulting in each segment reporting sequentially better operating results*.

89.     **False Statement**: On July 31, 2012, defendants hosted a conference call with investors and analysts to discuss General Cable's 2Q12 financial performance and the Company's business.  Robinson led the call and repeated and addressed the Company's 2Q12 financial results.  During his opening statement, Robinson announced: "***We are pleased to report adjusted operating income and adjusted EPS were within our guidance range for the second quarter, as each of our segments reported sequentially stronger results***."

90.     **False Statement**: On August 3, 2012, General Cable filed its 2Q12 Form 10-Q report with the SEC.  The Form 10-Q report detailed the Company's 2Q12 financial results and incorporated directly or by reference financial results from previous fiscal periods.  Defendant Robinson signed the Form 10-Q, and both Kenny and Robinson signed Sarbanes-Oxley certifications substantially similar to those quoted above.

91.     Defendants' foregoing statements were false and misleading when made because defendants knowingly or recklessly concealed the true facts bearing on those statements, including that:

>       (a)     General Cable's financial results reported in press releases, SEC filings and investor conference calls were materially false, did not fairly present the Company's financial condition for the respective fiscal periods, had to be restated and could not be relied upon as defendants had to admit;

(b)     General Cable's reported financial results consistently and materially misstated the Company's net income, operating income and EPS throughout the Class Period, in violation of GAAP;

(c)     General Cable's reported financial results specifically violated GAAP by:

(i)     improperly understating the costs of sales expenses;

(ii)     overstating net income, EPS and inventory balances by improperly accounting for inventory and VAT assets in the Company's ROW operation in Brazil;

(iii)     understating the cost of sales expenses and overstating inventory; PP&E; and comprehensive income by improperly recording erroneous foreign currency adjustments in related VAT assets in the Brazil operations in the ROW segment;

(iv)     improperly inflated net income and EPS by recognizing premature, inflated and fictitious revenue associated with "bill and hold" sales; and

(v)     improperly accounting for numerous other transactions by understating various expense accounts while overstating related asset accounts, which was achieved by delaying expense and charge reporting through improper capitalization of costs and misuse of accruals and failing to record inventory shortfalls timely.

(d)     the Sarbanes-Oxley certifications, attesting to the accuracy of the financial results and effectiveness of the Company's internal controls and signed by Kenny and Robinson, were false when made; and

(e)     General Cable's mandatory SEC reporting on Forms 10-Q and 10-K did not comply with Rule 13a-15 of the 1934 Act, which mandates the "issuer's management must evaluate, with the participation of issuer's principal executive and principal financial officers . . . the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter."

92.     Defendants made sure the above-referenced statements were publicly disseminated and filed with the SEC so that investors and the market would rely on them to increase General Cable's stock price, which they did, but should not have given their material falsity, as defendants finally had to admit.

**Defendants' Initial Admission that General Cable's Financial Statements Were Materially False and Would Be Restated and the Continuing Falsity of Their Financial Reporting**

93.     **False Statement**: On October 29, 2012, defendants published a *Business Wire* news release reporting the Company's 3Q12 financial results for the period ended September 28, 2012. The Company reported net income of $31.4 million, diluted EPS of $0.62, and operating income of $75.4 million for the period ended September 28, 2012.

94.     In the same release, defendants disclosed for the first time that certain inventory-related accounting errors had been identified in ROW facilities.  The release further revealed that General Cable intended to correct the effect of this improper accounting by restating certain previously issued financial statements.  The release stated:

**Restatement**

The Company has identified certain inventory related accounting errors in two facilities located in Brazil and a third facility located in South Africa within the Company's ROW segment that were erroneously computing cost of sales over the course of several years, resulting in an understatement of cost of goods sold and an overstatement of ending inventory.  All three locations were utilizing the same system and related process, which, with respect to work-in-process and finished goods, incorrectly computed cost of sales.  In addition, because the erroneous process was in place at one of the Brazilian facilities prior to the Company's acquisition of Phelps Dodge International Corporation ("PDIC") in 2007, the Company overstated inventory in its allocation of the purchase price among assets acquired, resulting in an understatement of goodwill.

On October 26, 2012, the Audit Committee of the Company's Board of Directors, upon the recommendation of the Company's executive officers, concluded that due to these inventory related accounting errors within the Company's ROW segment in two countries as described above, the Company's previously issued consolidated financial statements for fiscal years 2009 through 2011 and the related

- 39 -

reports of its independent registered public accounting firm, the interim periods during those years, and the financial statements as of, and for the periods ended March 30, 2012 and June 29, 2012 should no longer be relied upon.

Based on preliminary information relating to these errors, the Company currently estimates that it understated cost of sales for the years ended December 31, 2011, 2010, 2009, and 2008, and for the three months ended March 30, 2012 and six months ended June 29, 2012, by $17.3 million, $5.7 million, $8.6 million, $6.2 million, $1.2 million, and $3.5 million, respectively. The Company currently estimates that it overstated inventory balances as of December 31, 2011, 2010, 2009 and 2008, March 30, 2012 and June 29, 2012, by $39.0 million, $26.6 million, $19.5 million, $8.0 million, $41.1 million and $39.8 million, respectively. The understated goodwill and overstated inventory associated with the acquisition of PDIC in the fourth quarter of 2007 are each currently estimated at $3.4 million. The Company continues to analyze the impact of these inventory accounting related errors on its prior financial statements.

*     *     *

The Company intends to correct the effect of the accounting errors described above on previously issued interim financial statements by restating the three and nine months ended September 30, 2011 that will be presented comparatively in its Quarterly Report on Form 10-Q for the period ended September 28, 2012 and amending previously filed Forms 10-Q for the periods ended June 29, 2012 and March 30, 2012. Contemporaneous with the filing of the above referenced Quarterly Reports, the Company also intends to file an Annual Report on Form 10-K/A to restate previously issued annual financial statements and related financial information contained therein as of December 31, 2011 and 2010 and the three year period then ended.

Due to the ongoing process of preparing revised financial statements for these prior periods, the Company has provided only selected financial data tables in this press release.

95.     Following this disclosure, General Cable's stock price dropped nearly 4% to close at $28.53 per share on October 31, 2012, a significant change in price that cannot be explained by any then present market or industry events or forces.

96.     On November 7, 2012, General Cable filed its 3Q12 Form NT 10-Q with the SEC for the period ended September 28, 2012. The Form NT 10-Q report disclosed that due to the previously disclosed accounting errors "the Company's previously issued consolidated financial statements for fiscal years 2009 through 2011 (and the related reports of its independent registered

- 40 -

public accounting firm), the interim periods during those years, and the financial statements as of, and for the periods ended March 30, 2012 and June 29, 2012 should no longer be relied upon."

97.     In that same report, defendants reasserted that the "Company intends to correct the effect of the accounting errors on previously issued interim financial statements by (i) restating the financial statements for the three and nine months ended September 30, 2011 that will be presented comparatively in its Quarterly Report on Form 10-Q for the period ended September 28, 2012 (the Form 10-Q") and (ii) restating financial statements for the other periods referenced in the preceding paragraph and including the restated financial statements in amended periodic reports."

98.     Defendants further disclosed that:

Until this effort is completed, the Company will not be able to complete the financial statements to be included in the Form 10-Q, will not be in a position to enable its independent registered public accounting firm to complete their financial statement review, and will be unable to complete its management's discussion and analysis of financial condition and results of operations.  Moreover, the Company's disclosures regarding disclosure controls and procedures and material changes in internal control over financial reporting are, to some extent, dependent upon assessments related to the restatement effort.  Despite the extensive commitment of time and effort by the Company's management and financial staff, as well as ongoing communications with, and review of information by, the Company's independent registered public accounting firm, the Company is unable to complete the formidable tasks described above within 40 days subsequent to the end of its fiscal quarter ended September 28, 2012.

99.     **False Statement**: On February 25, 2013, General Cable issued a press release announcing its 4Q12 financial results for the period ended December 31, 2012.  The Company reported operating income of $5.5 million, diluted EPS of $0.35, and a net loss of $17.3 million.

100.    **False Statement**: On March 1, 2013, General Cable filed its Form 10-K/A report for the FY2011, ended December 31, 2011, and Form 10-Q/A reports for 1Q12 for the period ended March 30, 2012, and 2Q12, for the period ended June 29, 2012.  These reports presented restated financial results for the respective periods.  Defendant Kenny signed the Form 10-K/A report and defendant Robinson signed the Form 10-Q/A reports, and both Kenny and Robinson signed

- 41 -

certifications pursuant to Rule 13(a)-14(b) of the 1934 Act stating that the financial information contained in the Forms 10-K/A and 10-Q/A reports was accurate and disclosed any material changes to the Company's internal control over financial reporting.

101.    The Form 10-K/A and 10-Q/A reports provided comment on the restatement of the Company's consolidated financial statements, which included the following (or substantially similar) language:

> On October 29, 2012, the Company announced that it had identified historical accounting errors relating to inventory. The inventory accounting issues resulted in understated cost of sales and overstated inventory balances for the years ended December 31, 2011, 2010 and 2009. For the years ended December 31, 2011, 2010, 2009, and 2008, for the three months ended March 30, 2012 and six months ended June 29, 2012 and for the three and six months ended July 1, 2011 cost of sales was understated by $17.9 million, $8.3 million, $5.6 million, $7.1 million, $2.7 million, $6.2 million, $4.3 million and $8.3 million respectively. As of December 31, 2011, 2010, 2009 and 2008, March 30, 2012 and June 29, 2012 inventory balances were overstated by $40.0 million, $27.0 million, $17.4 million, $8.7 million, $43.7 million, and $43.5 million, respectively.

> The Company believes that the inventory accounting issues are, to a significant extent, attributable to a complex theft scheme in Brazil and, to a somewhat lesser extent, accounting errors, primarily in Brazil, affecting work in process and finished goods inventory that were not detected due to a deficient reconciliation process. In addition, due to accounting errors at one of the Brazilian facilities that occurred prior to the Company's acquisition of PDIC in 2007, the Company overstated inventory in its allocation of the purchase price among assets acquired, resulting in an understatement of goodwill. The understated goodwill and overstated inventory associated with the acquisition of PDIC in the fourth quarter of 2007 is each $3.4 million.

> The Company is also restating cost of sales, inventory, property, plant and equipment, accumulated other comprehensive income and retained earnings to correct two additional accounting errors associated with foreign currency adjustments, described below.

> The Company incorrectly recorded foreign currency adjustments related to certain intercompany transactions between the Company's U.S. and Canadian subsidiaries in other comprehensive income rather than in other income (expense) in the Condensed Consolidated Statements of Operations and Comprehensive Income (Loss). The Company has corrected this error in the accompanying restated financial statements. As of December 31, 2011 and 2010, accumulated other comprehensive income was overstated, and retained earnings were understated, by $6.5 million

- 42 -

before consideration of the related income tax provision of $3.0 million, including foreign currency translation.

The Company also made erroneous foreign currency adjustments related to inventory and property, plant and equipment within the Company's Mexican subsidiary. The Company has corrected this error in the accompanying related financial statements. As of December 31, 2011, 2010 and 2009, inventory was overstated by $3.1 million and property, plant and equipment were overstated by $5.0 million, while retained earnings were understated by $8.1 million, prior to foreign currency translation. In addition, cost of sales is understated for the year ended December 31, 2009 by $8.1 million.

102.    **False Statement**: Also on March 1, 2013, defendants filed General Cable's 3Q12 Form 10-Q report with the SEC for the period ended September 28, 2012. The Form 10-Q/A report detailed General Cable's 3Q12 financial results and incorporated directly or by reference financial results from previous fiscal periods. Defendant Robinson signed the Form 10-Q and Kenny and Robinson signed Sarbanes-Oxley certifications substantially similar to those quoted above.

103.    **False Statement**: Additionally, on March 1, 2013, the Company filed its FY2012 Form 10-K report for the period ended December 31, 2012. The Form 10-K report was signed by defendants Kenny and Robinson, reiterated the Company's previously reported financial results, incorporated directly or by reference financial results from previous fiscal periods, and included Sarbanes-Oxley certifications signed by Kenny and Robinson substantially similar to those quoted above.

104.    **False Statement**: On April 30, 2013, defendants issued a press release announcing its 1Q13 financial results for the period ended March 29, 2013. The Company reported a net income loss of $46.5 million, diluted EPS of $0.94, and operating income of $32.0 million, and a net loss of $46.5 million.

105.    **False Statement**: On May 7, 2013, the Company filed its 1Q13 Form 10-Q report with the SEC. This report presented 1Q13 financial results and incorporated directly or by reference financial results from previous fiscal periods. Robinson signed the Form 10-Q report, which

included Sarbanes-Oxley certifications signed by defendants Kenny and Robinson substantially similar to those quoted above, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

106.    **False Statement**: On July 31, 2013, defendants issued a press release announcing its 2Q13 financial results for the period ended June 28, 2013. The Company reported net income of $12.1 million, diluted EPS of $0.24, and operating income of $71.8 million. The release continued:

**<u>Other Matters</u>**

Due to the matters discussed below, the Company has provided only selected financial data tables in this press release.

*        *        *

In addition, the Company is evaluating a potential adjustment related to value added tax (VAT) in Brazil that is associated with the theft of inventory. The Company requires additional time to fully evaluate and conclude on this VAT matter but believes preliminarily that this potential adjustment may result in additional expenses in the range of $7 to $14 million in total to be recorded in the applicable periods for the years ended December 31, 2012, 2011, 2010, 2009 and 2008, respectively.

At the present time, management does not believe that these items, either individually or in the aggregate, have a material impact on previously filed financial statements. Further, due to the impact of the above matters on the presentation of the Company's financial statements in its Form 10-Q for the quarter ended June 28, 2013, the Company will delay the filing of that Form 10-Q until the Company amends the Company's 2011 Form 10K/A and subsequent periodic filings above. The Company is endeavoring to bring these matters to conclusion as quickly as possible and then will initiate the amendment of prior filings.

107.    Defendants' foregoing statements were false and misleading when made because defendants knowingly or recklessly concealed the true facts bearing on those statements, including that:

(a)      General Cable's financial results reported in press releases and SEC filings were materially false, did not fairly present the Company's financial condition for the respective fiscal periods, had to be restated and could not be relied upon as defendants had to admit;

(b)      General Cable's reported financial results consistently and materially misstated the Company's net income, operating income and EPS throughout the Class Period, in violation of GAAP;

(c)      General Cable's reported financial results specifically violated GAAP by:

(i)      improperly understating gross profit;

(ii)      overstating net income, EPS by improperly accounting for VAT assets in the Company's ROW operation in Brazil;

(iii)      overstating net income and EPS, in the quarters before 2Q13, by failing to properly account for VAT assets in the Brazil operations in the ROW segment;

(iv)      improperly inflated net income and EPS by recognizing premature, inflated and fictitious revenue associated with "bill and hold" sales; and

(v)      improperly accounting for numerous other transactions by understating various expense accounts while overstating related asset accounts, which was achieved by delaying expense and charge reporting through improper capitalization of costs and misuse of accruals and failing to record inventory shortfalls timely.

(d)      the Sarbanes-Oxley certifications, attesting to the accuracy of the financial results and effectiveness of the Company's internal controls and signed by Kenny and Robinson, were false when made; and

(e)      General Cable's mandatory SEC reporting on Forms 10-Q and 10-K did not comply with Rule 13a-15 of the 1934 Act, which mandates the "issuer's management must evaluate,

with the participation of issuer's principal executive and principal financial officers . . . the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter."

108.    Defendants made sure the above-referenced statements were publicly disseminated and filed with the SEC so that investors and the market would rely on them to increase General Cable's stock price, which they did, but should not have given their material falsity, as defendants finally had to admit.

**General Cable Discloses Its Previous Restatement Is Materially Flawed and that Its Financial Statements Must Be Restated a Second Time**

109.    On October 15, 2013, through a Form 8-K report to the SEC, defendants disclosed that General Cable's financial statements for FY2008 through the fiscal period ended March 29, 2013 should no longer be relied upon.  To address the Company's improper treatment VAT and revenue recognition in connection with historical bill-and-hold transactions for aerial transmission projects in Brazil, General Cable stated it would again restate financial results for 2009 through the fiscal period ended March 29, 2013.  As defendants explained:

> **Item 4.02        Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**.
>
> On October 10, 2013, the Audit Committee of the Company's Board of Directors, upon the recommendation of the Company's executive officers, concluded that due to certain accounting errors, in the aggregate, related to i) value added tax (VAT) and ii) revenue recognition in connection with historical "bill and hold" transactions for aerial transmission projects in Brazil as further described below, the Company's previously issued consolidated financial statements for the fiscal years 2008 through 2012 (and the related reports of its independent registered public accounting firm) and the interim periods during those years, and the financial statements as of, as well as for, the three fiscal months ended March 29, 2013 should no longer be relied upon.
>
> As a result of the theft of inventory and inventory accounting errors in Brazil disclosed in Amendment No. 1 to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 and in other previous filings, the Company undertook an extensive evaluation, with the assistance of external accounting consultants and external legal counsel, to determine whether an adjustment related to value added tax (VAT) in Brazil associated with the inventory theft and accounting

- 46 -

errors was necessary. The Company previously disclosed its evaluation of a potential adjustment related to VAT in its Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on July 31, 2013 (the "July 31 Form 8-K"). Based on its evaluation, the Company no longer expects to recover approximately $18 million of VAT credits that were previously recognized from 2008 to 2012.

110. On this news, the Company's stock price dropped $1.63 per share on October 15, 2013, to close at $32.24 per share, a one-day decline of 5% on high trading volume.

## FURTHER ALLEGATIONS OF DEFENDANTS' SCIENTER

111. Defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued in the Company's name were materially false, that such statements or documents would be disseminated to the investing public, and that they substantially participated or acquiesced in the issuance or dissemination of such statements or documents causing primary violations of the federal securities laws. As set forth herein in detail, defendants participated in the fraudulent scheme alleged by reason of their receipt of information reflecting the true facts regarding General Cable, their control over, receipt or modification of General Cable's allegedly materially false statements; and their association with the Company which made them privy to confidential proprietary information concerning General Cable.

**Individual Defendants Were Legally Obligated to Ensure Effective
Financial Controls and Repeatedly Assured Regulators and Investors
that General Cable's Financial Controls Were Effective**

112. As discussed, Kenny and Robinson had primary legal responsibility for ensuring that General Cable had effective internal financial controls. And Rule 13(a)-15(f) of the 1934 Act makes the expected scope of these assurances clear:

> [T]he term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of

- 47 -

financial statements for external purposes in accordance with generally accepted accounting principles.

113.     Additionally, Kenny and Robinson were intimately familiar with General Cable's financial reporting and financial controls as a result of their extended association with and management of the Company.  Kenny had been employed as General Cable's CEO and President since 2001, and as either President or COO since 1997.  Robinson was a Certified Public Accountant and had worked at General Cable since 1999.  He has been the CFO since 2007 and the Company's Controller since 2000.  As General Cable's Controller from 2000 to February 2006, Robinson was necessarily involved in the identification and remediation of the earlier material weaknesses in internal financial reporting controls at issue in 2004 and 2005.  Robinson was particularly qualified to understand the importance and evaluation of the effectiveness of internal controls for financial reporting and disclosures.  Indeed, this is what he would have done as an auditor at General Cable's independent audit firm, Deloitte, for eight years.  As a Senior Auditor Manager in Deloitte's Cincinnati, Ohio office, a significant part of Robinson's responsibilities would have included understanding, documenting and testing the design and effectiveness of his clients' internal controls to determine if Deloitte could rely on them through its audits.  Robinson ended his Deloitte tenure as Audit Manager for companies with global operations, precisely the type of business organization General Cable represented.

114.     General Cable's published Code of Ethics, adopted by the Company's Board of Directors, similarly acknowledged and touted the duties of General Cable employees to follow internal controls in order to ensure accurate financial reporting:

Accurate Records

We expect all of our business records to be accurate, timely, complete, fair and understandable. . . . We must each do our part to ensure that the financial documents our Company discloses are accurate and honest.  This means that we must all:

- Follow documented and/or reasonably appropriate financial controls

- Not make any false or artificial entries in General Cable's books or records.

115.   Notwithstanding these legal and corporate obligations, the Individual Defendants' repeated assurances of compliance are contradicted by General Cable's repeated and extensive financial restatements, SEC filing revisions and the reports of former employees summarized below. Kenny and Robinson's clear legal duties to ensure adequate financial controls and their repeated acknowledgement of those duties strongly supports scienter in their failing to carry out those responsibilities.

**General Cable's History of Ineffective Financial Controls Put Kenny and Robinson on Notice of the Need to Impose Effective Controls over Its ROW Operations and Further Evidences Scienter**

116.   General Cable's failure to impose effective internal controls over the ROW operations was particularly reckless given General Cable's prior history of ineffective financial controls.  These controls involved the same type of reporting weaknesses that led to the restatements and control problems at issue here.  They include the Company's ability to accurately track inventory and record receiving transactions and the failure to police access to computer systems.

117.   Specifically, on April 29, 2005, General Cable was forced to admit that its financial controls were materially ineffective and constituted a "material weakness."  *See* PCAOB's Auditing Standard, No. 2.  In its amended Form 10-K/A report for FY2004, the Company admitted:

> The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2004, which identified ***the following material weaknesses*** in the Company's internal control over financial reporting:
>
> - ***Controls over access to computer applications and segregation of duties with respect to both its manual and computer based business processes***.
>
> - ***Controls over the recording of inventory shipments*** and revenue in the proper accounting period.

- 49 -

- Controls over the recording of receiving transactions and non-purchase order based accounts payable transactions in the proper accounting period.

- Controls over the liability estimation and accrual process, including income tax reserves.

- Controls over finished goods inventory on consignment at customer locations.

- The design and implementation of adequate controls to address the existence and completeness of fixed assets included in the financial statements, including returnable shipping reels, and the effectiveness of controls over recording of fixed asset acquisitions in the proper accounting period.

- The design of adequate controls relating to the purchasing function, including review and approval of significant third-party contracts and the maintenance of vendor master files.

- ***The design and implementation of adequate controls over the financial reporting and close process, including controls over non-routine transactions***. These deficiencies were primarily attributable to the sufficiency of personnel with appropriate qualifications and training in certain key accounting roles in order to complete and document the monthly and quarterly financial closing process.

- ***The general control environment was ineffective due to the aggregation of the material weaknesses listed above***.

A "material weakness" in internal control presents a serious, meaningful event and evidences the real possibility that a material misstatement of General Cable's 2004 annual and interim financial statements would not be detected or prevented. General Cable explained that as a result of these deficiencies, material adjustments were necessary in order to present the 2004 financial statements in accordance with GAAP. These adjustments were primarily related to the recorded balances in accounts receivable, inventories, accounts payable, accrued liabilities, revenues, cost of sales, and income taxes. These deficiencies were deemed material weaknesses due to the misstatements identified, the potential for further misstatements given these internal control deficiencies and the

lack of other mitigating controls.  Remarkably, these are the same types of internal control failures that led to the restatements in this case.

118.    As General Cable's then CEO, President and a director, Kenny signed the amended Form 10-K report for FY2004 specifically identifying the control problems.  Robinson was a Vice-President and the Company's Controller when the report was filed with the SEC.

119.    To make matters worse, on December 7, 2005, General Cable had to file amended 1Q05, 2Q05 and 3Q05 Form 10-Q reports.  These reports disclosed that the efforts to address General Cable's internal control weaknesses had not been completed.  Kenny and Robinson continued to conclude that the Company's material weakness in internal controls persisted and that its controls continued to be ineffective for nearly all of 2005.  Accordingly, both of the Individual Defendants were aware of General Cable's prior inventory control and financial reporting deficiencies and the need to address those weaknesses further in connection with the PDIC acquisition and ROW operations.

120.    In addition to disclosing extensive material weaknesses in the Company's internal controls, General Cable was required to issue numerous other revisions to its public filings.  For example, on November 8, 2006, General Cable announced that it was revising its annual Form 10-K and its Form 10-Q reports for 1Q06 and 2Q06 to correct and restate the Company's segment reporting.  Subsequently, in 2009, General Cable also amended its Form 10-K report for 2008 *three times* to correct various errors, including corrected Sarbanes-Oxley exhibits.

**Following the PDIC Acquisition, Kenny and Robinson Failed to Impose Internal Controls Over Its International Operations Despite Knowledge of the Company's History of Ineffective Internal Controls**

121.    Ignoring the duties set out above, when General Cable acquired PDIC and its international operations in October 2007, rather than imposing effective operating and financial reporting controls, defendants instead allowed General Cable's ROW segment, and particularly the

new Brazilian operations, to operate on their own and without meaningful supervision.  For example, rather than bringing ROW under General Cable's existing internal control and Sarbanes-Oxley compliance framework so that managers in General Cable's corporate headquarters could actually assess and evaluate the new segment's internal financial controls and Sarbanes-Oxley compliance, PDIC was permitted to continue operating its own internal control system separately.  Indeed, PDIC's Sarbanes-Oxley compliance consultant, policyIQ, bragged that PDIC had been incorporated into General Cable without having to "re-implement or re-invent the wheel," since PDIC was simply continuing many of its prior compliance practices.  According to CW1,[9] the Company operated in a very decentralized manner, with the ROW operations using a completely different financial system than the rest of the Company.  Moreover, there was never any discussion about integrating the ROW operations into the General Cable financial reporting system.  CW1.  Consolidated ROW financial results were submitted electronically and consolidated using the Hyperion application, but "if you ever tried to get any details behind those numbers, good luck."  CW1.  Kenny justified the lack of integration by saying, "Hey, they are a successful organization, leave them alone, let them do their thing."  CW1.

122.    CW3 confirms that proper steps were not taken to merge operations in Brazil with the rest of the Company or to convert the subsidiaries' information systems to the systems used by General Cable.  CW2[10] stated that PDIC's accounting system was not well utilized and compromised

---

[9]    CW1 worked at General Cable from 2005 through 2013, in positions including North America Controller, North America Director of Finance, and Director of Compliance responsible for Sarbanes-Oxley compliance.  This witness participated in finance meetings during which the Company's ROW and Brazilian operations were discussed.

[10]   CW2 worked at PDIC in Brazil as a Cost Analyst from June 2008 to August 2011.  CW2 was responsible for managing corporate budgets, and for making closing journal entries at the ends of monthly and quarterly accounting periods, including for inventory-related costs in the BPCS system.

accounting controls, and CW4[11] explained that the lack of an integrated system allowed inaccurate manual adjustments and significantly increased inventory discrepancies.  The manual adjustments led to discrepancies between physical inventory counts and the amounts shown on the BPCS system, of which CW2's superiors were aware.  CW2.  If a significant discrepancy existed, it was assumed there had to be something wrong with the inventory count.  CW2 recalled a particular inventory discrepancy of $1.8 million between the physical inventory count and the amount shown on the BPCS system.  When a large discrepancy between the inventory detail within the accounting system and a physical inventory account was detected, PDIC management would not believe the difference was real.  CW2.  As a result of the "fragile" accounting systems, ROW, and Brazil in particular, had problems with inventory evaluation control and poor quality physical counts.  CW4.  Due to differences between the expected system counts and the actual physical counts, *adjustments were required, but were not made for years* and resulted in large differences between the system counts and the actual physical counts.  CW4.  In contrast with General Cable facilities in the United States, which could conduct an inventory count in four hours, an inventory count in Brazil, for example, could take a week because basic processes and controls either did not exist or were faulty.  CW1.  In addition, General Cable's internal audit group was known in the ROW to be ineffective and poorly staffed.  CW1.

123.   CW6[12] further confirmed that the ROW's IT system was not integrated with the rest of General Cable and that South America alone had at least three different systems reporting to

---

[11]   CW4 worked at PDIC as an Accounting Manager in Brazil from 2005 through 2013.  In that position, CW4 worked with and was responsible for financial accounts in PDIC's Brazilian operations.

[12]   CW6 worked at General Cable from September 2012 through June 2013 as the Vice President of Information Technology.  He worked with the North America, Europe and ROW regions and was responsible for supervising the integration of the Company's IT systems.

- 53 -

Miami.  General Cable itself had four different email systems and different firewalls for each region. CW6 also stated that rather than being controlled by "corporate," the power at General Cable was primarily in the operating regions.  CW5 similarly explained that the biggest problem CW5 saw was that General Cable never integrated with PDIC, instead "they were running as basically two separate companies."

124.   As a result, any problem with theft would be difficult to detect and internal books could be manipulated to conceal missing inventory.  To the extent discrepancies between existing inventory counts and internal accounts were discovered, the discrepancies would be believed to be simple booking errors (as opposed to outright theft) or would be extremely difficult to trace, confirm and understand, as demonstrated by extreme difficultly General Cable admittedly experienced in issuing the restatements in this case.  The five-year-plus theft that occurred at General Cable's Brazilian facilities was directly facilitated and made possible by a lack of standard material internal controls.

125.   The lack of integration and supervision was aggravated by a refusal by ROW management to operate transparently.  When General Cable's finance department employees tried to obtain information concerning the new ROW operations, the ROW manager, for example, refused and threw a "tantrum."   CW1 Instead of requiring cooperation, Kenny directed the finance department to back off.  CW1 participated in finance meetings where the Company's Brazilian operations were discussed and described the operations in Brazil as "a bit of a train wreck . . . like a bunch of cowboys."  CW1 recalls that the former corporate global controller for General Cable struggled to get acceptable financial information from the ROW group.

126.   According to CW1, General Cable's corporate controller was constantly battling with the ROW CFO to get information, but Kenny and Robinson would step in and direct the global

controller to back off and would question whether the requested information was really necessary. According to CW1, the ROW CEO would "go ballistic" to Kenny and Robinson if anyone attempted to interact with any of the units in his group.  As a result Kenny and Robinson would simply defer to the ROW CEO.  The controller would complain to CW1 that Robinson would not stand up to the executives in the ROW region and was clueless, while Robinson would complain to CW1 that the controller was not getting along with people.

**General Cable's Post-Restatement Measures Identify Reasonable and Readily Available Practices that General Cable Failed to Employ During the Class Period to Ensure Sound Business, Accounting and Internal Control Practices**

127.    Following the restatements, General Cable announced a response to the internal control deficiencies, a response that both admits and demonstrates that the Company's internal control deficiencies could and should have been prevented easily by applying readily available control measures.  According to General Cable's January 21, 2014 Form 10-K/A report, the Company has and now is taking the following steps to improve its internal controls:

- The Company now conducts monthly physical inventory counts in Brazil that include reconciliation of inventory values to the general ledger balances, in addition to the previous practice of reconciling physical inventory quantities to the inventory quantities recorded in the perpetual inventory system.

- The Company engaged an independent consultant, who had no prior affiliation with the Company.  The consultant's principal duties, all of which relate to the Company's Brazilian operations, were the following:

  - Ensure the monthly physical count process and reconciliation of inventory quantities and values in the perpetual inventory system and the general ledger are adequately controlled.

  - Identify control improvements within the costing and inventory areas, including controls relating to the inventory reconciliation process and management review.

  - Participate in the ongoing perpetual inventory system upgrade (discussed below) to ensure that controls are adequately planned and considered.

- 55 -

- Assist with the monthly accounting close process, particularly in areas susceptible to management override.

The consultant's engagement ended in July 2013.  During the time the consultant was engaged, the Company hired a new cost accounting manager and other cost accounting personnel, who are performing the ongoing tasks formerly addressed by the consultant.  The Company also hired a new Brazil Controller, who is, among other things, overseeing the work of the cost accounting department.

\*        \*        \*

- Company management directed specified ROW personnel to develop and implement an upgrade to the perpetual inventory system for the Brazilian facilities.  The objective of the upgrade is to automate cost of sales calculations within the system and enhance other inventory controls, such as tracking of usage variances and control of scrap.  This project is subject to the oversight of the Company's Global Finance and Accounting personnel.

- The Company has taken steps to enhance centralized oversight of the financial function in Brazil and the other business units in ROW.  Specifically:

\*        \*        \*

  - All ROW Chief Financial Officers reported directly to the Company's Global Controller from November 2012 through May 2013.  In May 2013, a new financial reporting structure was implemented, under which the ROW Chief Financial Officers reported to the Company's Chief Financial Officer.  On September 30, 2013, the Company retained a new sub-region Latin America Chief Financial Officer, and all Latin America Chief Financial Officers now report to him.

- The Company initiated measures throughout ROW to reinforce the Company's management focus on open communication of ROW business unit leaders with the Company's management and internal auditors and on ethical behavior . . . .

128.    Had these basic steps to ensure effective control over financial reporting and disclosure been undertaken when PDIC's international operations began operating under General Cable's banner – consistent with defendants' repeated assurances – the restatements and investors' losses could have been avoided.

- 56 -

**The Misconduct in This Case Was Motivated by Millions of Dollars in Incentive Compensation and Severe Business Pressures on the Operating Units**

129.    Throughout the Class Period, Kenny and Robinson's compensation included millions of dollars of "incentive compensation," compensation directly dependent on General Cable and the Individual Defendants meeting corporate financial and other targets.  The incentive compensation for Kenny, Robinson, and other corporate managers included both bonuses provided through the Company's Annual Incentive Plan and additional incentive compensation under the Stock Incentive Plan.  The Annual Incentive Plan provided for cash bonuses tied to financial performance targets, including, *inter alia*, corporate earnings per share, while stock incentive compensation was driven by increasing the Company's stock price.  As reported by General Cable's 2013 Schedule 14A, Definitive Proxy Statement, salary represented only 15% of Kenny's compensation for 2012, with variable incentive payments making up the remaining 85%.  The following chart sets out Kenny and Robinson's salary and incentive compensation for 2007 through 2013.

**Individual Defendants' Incentive Compensation**

| Gregory B. Kenny | Salary | Salary as Percentage of Total Compensation | Stock Awards | Option Awards | Non-Equity Incentive Compensation | Incentive Compensation as Percentage of Total Compensation | Other | Total |
|---|---|---|---|---|---|---|---|---|
| 2007 | $749,038 | 12% | $578,748 | $362,758 | $1,423,557 | 37% | $3,275,922 | $6,390,023 |
| 2008 | $823,270 | 22% | $742,347 | $1,128,380 | $843,975 | 73% | $172,648 | $3,710,620 |
| 2009 | $856,731 | 22% | $646,470 | $1,758,366 | $424,000 | 74% | $137,431 | $3,822,998 |
| 2010 | $825,000 | 21% | $488,800 | $1,490,324 | $861,780 | 79% | $112,778 | $3,778,682 |
| 2011 | $891,346 | 17% | $728,790 | $2,627,543 | $568,400 | 83% | $143,026 | $4,959,105 |
| 2012 | $900,000 | 15% | $910,000 | $3,112,234 | $312,500 | 85% | $127,460 | $5,362,194 |
| 2013 | $900,000 | 19% | $845,760 | $2,942,007 | $166,250 | 81% | $112,106 | $4,966,123 |

| Brian J. Robinson | Salary | Salary as Percentage of Total Compensation | Stock Awards | Option Awards | Non-Equity Incentive Compensation | Incentive Compensation as Percentage of Total Compensation | Other | Total |
|---|---|---|---|---|---|---|---|---|
| 2007 | $253,943 | 31% | $91,581 | $36,992 | $272,354 | 50% | $152,679 | $807,549 |
| 2008 | $313,652 | 31% | $144,082 | $288,116 | $225,000 | 64% | $50,712 | $1,021,562 |
| 2009 | $327,115 | 25% | $195,900 | $586,122 | $131,900 | 71% | $47,933 | $1,288,970 |
| 2010 | $315,000 | 26% | $146,640 | $427,778 | $264,225 | 74% | $42,474 | $1,196,117 |
| 2011 | $368,077 | 15% | $1,028,880 | $723,177 | $159,250 | 85% | $53,598 | $2,332,982 |
| 2012 | $375,000 | 20% | $260,000 | $855,409 | $135,000 | 80% | $47,715 | $1,673,124 |
| 2013 | $440,019 | 23% | $317,160 | $1,117,218 | $61,180 | 77% | $42,391 | $1,977,968 |

NOTE: Percentages for 2007-2009 are estimated, and for 2010-2013 are taken from the respective Schedule s 14A.

940903_1

130.    Similar incentives also motivated lower-level managers and employees.  Defendants acknowledge in General Cable's January 21, 2014 Form 10-K/A report for FY2012 at 46, that employees in the ROW region were subject to undue business pressure, at the expense of accurate internal financial reporting.  Former ROW personnel confirm this pressure to perform.  Several have stated that incentive compensation for ROW management was tied to goals relating to financial and operational targets, that there was inordinate pressure to meet these goals and that Company-wide targets had to be met for the individual incentives to kick in, CW1, and that ROW was experiencing such pressure to improve its margins.

131.    Clearly, as General Cable's most senior executives, Kenny and Robinson had management responsibility over the entire Company – the finance department in particular – and control of the Company's SEC filings and public statements.  Kenny and Robinson thus not only had the motive to conceal General Cable's lack of adequate controls, but they also had the ability and opportunity to do so.

## LOSS CAUSATION AND ECONOMIC LOSS

132.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated and maintained General Cable's stock price and operated as a fraud or deceit on Class Period purchasers of the Company's publicly traded stock.  Defendants did this by issuing materially financial statements and falsely certifying that those statements reflected effective internal financial reporting controls and accurately captured the Company's financial performance for 21 fiscal quarters.  When defendants finally admitted the falsity of the Company's financial reporting and announced the need to restate and correct its prior financial reports, General Cable's stock price fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of General Cable securities

- 58 -

during the Class Period, Lead Plaintiff and other members of the Class suffered significant economic loss, that is, damages under the 1934 Act.

133.    The market for General Cable common stock was open, well-developed and efficient at all relevant times.  As a result of these materially misleading statements and failures to disclose the true state of the Company's financial performance and internal financial reporting, General Cable stock traded at artificially inflated prices.  Lead Plaintiff and other members of the Class purchased or otherwise acquired General Cable common stock, relying upon the integrity of the market price of General Cable common stock and market information relating to General Cable, and ultimately suffered economic loss.

134.    Defendants' false and misleading statements had the intended effect and caused General Cable's stock to trade at artificially inflated levels.  As a direct result of the disclosures and admissions regarding material weaknesses in General Cable's internal financial reporting controls and the restatements of the Company's financial results on October 31, 2012 and October 15, 2013, General Cable's stock price suffered material, significant declines, declines unrelated to any market or industry events or forces.  These stock price drops removed the inflation from General Cable's stock price, causing real economic loss to investors who had purchased General Cable's stock during the Class Period.

135.    The declines in General Cable's stock price on October 31, 2012 and October 14, 2013 were direct results of the nature and extent of defendants' prior false statements and material omissions being revealed to investors and the market.  The timing and magnitude of General Cable's stock price declines negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.

136.    The economic loss Lead Plaintiff and other members of the Class suffered was a direct result of defendants' fraudulent scheme to artificially inflate General Cable's stock price and maintain the price at artificially inflated levels, as was revealed by the subsequent and significant declines in the value of General Cable's stock when defendants' prior misrepresentations and omissions became publicly available.

<strong>APPLICABILITY OF THE PRESUMPTION OF RELIANCE:<br>THE FRAUD-ON-THE-MARKET DOCTRINE</strong>

137.    At all relevant times, the market for General Cable common stock was an efficient market for the following reasons, among others:

(a)    General Cable common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, General Cable filed periodic public reports with the SEC and the NYSE;

(c)    General Cable regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    General Cable was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

138.    As a result of the foregoing, the market for General Cable common stock promptly incorporated current information regarding General Cable from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of

General Cable common stock during the Class Period suffered similar injury through their purchase of General Cable common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

139.    General Cable's verbal safe-harbor warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

140.    The defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized or approved by an executive officer of General Cable who knew that the forward-looking statement was false.   None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

141.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased the common stock of General Cable during the Class Period (the "Class").   Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

142.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.   General Cable stock was actively traded on the NYSE.   While the

- 61 -

exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by General Cable or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

143.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

144.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

145.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public misrepresented and omitted material facts about the business, operations and management of General Cable;

(c)    whether the price of General Cable common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

146.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

- 62 -

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

147.   Lead Plaintiff makes the allegations herein based upon personal knowledge as to itself and its own acts and upon the investigation of Lead Plaintiff's counsel, which included a review of regulatory filings made by General Cable with the SEC, other regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company as well as discussions with certain witnesses who provided Company-specific information confidentially.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### For Violation of §10(B) of the 1934 Act and Rule 10b-5
### Against All Defendants

148.   Lead Plaintiff repeats and realleges each allegation above as if fully set forth herein.

149.   During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

150.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes, and artifices to defraud;

- 63 -

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of General Cable securities during the Class Period.

151.    Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and financial performance of General Cable as specified herein.

152.    The defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of General Cable securities during the Class Period.

153.    The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with recklessness disregard for the truth, and for the purpose and effect of concealing General Cable's operating condition from the investing public and supporting the artificially inflated price of its publicly traded securities.

154.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of General Cable's publicly traded securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired General Cable securities during the Class Period at artificially high prices and were damaged thereby.

155.     At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that General Cable was experiencing, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their General Cable securities, or, if they had acquired such securities during the Class Period, would not have done so at the artificially inflated prices which they paid.

156.     By reason of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5.

157.     As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of General Cable securities during the Class Period.

158.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

159.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for General Cable securities.  Lead Plaintiff and the Class would not have purchased General Cable securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

For Violation of §20(A) of the 1934 Act
Against All Defendants

160.    Lead Plaintiff repeats and realleges each allegation above as if fully set forth herein.

161.    Defendants acted as controlling persons of General Cable within the meaning of §20(a) of the 1934 Act as alleged herein.  By reason of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by Lead Plaintiff to be misleading, prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

162.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day finance and accounting operations of the Company and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

163. As set forth above, each of these defendants violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By reason of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining and certifying that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  May 20, 2014

ROBBINS GELLER RUDMAN
   & DOWD LLP
JAMES A. CAPUTO
M. ALEXANDRA ROYAL


s/ JAMES A. CAPUTO
JAMES A. CAPUTO

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
JOHN K. GRANT
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiffs

VANOVERBEKE MICHAUD
   TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

- 68 -

940903_1

THE JAEGER FIRM, PLLC
STEVEN R. JAEGER
23 Erlanger Road
Erlanger, KY  41018
Telephone:  859/342-4500
859/342-4501 (fax)

Liaison Counsel

940903_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 20, 2014.

s/ JAMES A. CAPUTO
JAMES A. CAPUTO

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  JamesC@rgrdlaw.com

940903_1

# Mailing Information for a Case 2:14-cv-00022-WOB-CJS Doshi v. General Cable Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James Albert Caputo**
  jimc@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **David F. Fessler**
  dfessler@fsgattorneys.com

- **John K. Grant**
  johnkg@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Steven D. Jaeger**
  sdjaeger@thejaegerfirm.com

- **Steven R. Jaeger**
  srjaeger@thejaegerfirm.com

- **Thomas C. Michaud**
  tmichaud@vmtlaw.com

- **Karen Pieslak Pohlmann**
  kpohlmann@morganlewis.com

- **M. Alexandra Royal**
  aroyal@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Jeremy          Alan Lieberman
Pomerantz Haudek Block Grossman & Gross LLP
600 Third Avenue, 20th Floor
New York, NY 10016

Lesley          Frank Portnoy
Pomerantz Grossman Hufford Dahlstrom & Gross LLP
600 Third Ave, 20th Floor
New York, NY 10016

David           Avi Rosenfeld
```

```
Robbins, Geller Rudman Dowd LLP - Melville
58 S. Service Road
Suite 200
Melville, NY 11747
```

**Samuel         H. Rudman**
```
Robbins, Geller Rudman Dowd LLP - Melville
58 S. Service Road
Suite 200
Melville, NY 11747
```

**Marc            Sonnenfeld**
```
Morgan, Lewis & Bockius LLP (Philadelphia)
1701 Market Street
Philadelphia, PA 19103
```