**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

**CONSOLIDATED CIVIL ACTION NO. 2:14-cv-22 (WOB-CJS)**

**SATISH DOSHI, Individually**
**And on behalf of all other**
**Persons similarly situated**                                    **PLAINTIFFS**

**and**

**CITY OF LIVONIA EMPLOYEES'**
**RETIREMENT SYSTEM, Individually**
**And on behalf of all others**
**Similarly situated**

**VS.**                          **OPINION AND ORDER**

**GENERAL CABLE CORP., ET AL.**                          **DEFENDANTS**

Lead Plaintiff City of Livonia Employees' Retirement System brings this action on behalf of a class of persons and entities that purchased General Cable Corporation common stock between November 3, 2010, and October 14, 2013, inclusive (the "Class Period"). Plaintiffs allege that Defendant General Cable Corporation and two of its senior executives, individual Defendants Gregory B. Kenny and Brian J. Robinson,[1] engaged in a fraudulent scheme to inflate artificially General Cable's stock price in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs further allege that Kenny and Robinson are liable as "controlling persons" of General Cable, pursuant to § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78(t)(a). As evidence of fraud, Plaintiffs point to General Cable's

---

[1] Kenny has been President and Chief Executive Officer of General Cable since August 2001, and a Director since 1997. Robinson has been General Cable's Chief Financial Officer and Treasurer since 2007, and Executive Vice President since January 2008.

need to restate, on two occasions, previously issued financial data to correct material errors.  These restatements -- announced in 2012 and 2013[2] -- resulted in significant declines in General Cable's stock price.

This putative class action is before the Court on the defendants' motion to dismiss (Doc. 98).  Defendants argue that Plaintiffs have failed to state a claim upon which relief may be granted, asserting that Plaintiffs have not adequately pled scienter.  The Court heard oral argument on Wednesday, January 7, 2015, and thereafter took the motion under advisement.  After further study, the Court now issues the following Memorandum Opinion and Order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Parties and Summary of Allegations

General Cable is a publicly traded company that manufactures cable and wire for industrial uses around the world.  Based in Highland Heights, Kentucky, the company's operations, management, and financial reporting are divided into three geographic segments: North America; Europe and Mediterranean; and Rest of World ("ROW").

Plaintiffs' allegations focus on accounting errors principally affecting the ROW division -- specifically, operations in Brazil. General Cable established the ROW division in October 2007 after it acquired Phelps Dodge International Corp. ("Phelps Dodge") as a privately held subsidiary.  Phelps Dodge, which served markets in

---

[2] General Cable released the actual restated financial data in January 2013 and October 2013, respectively.

-2-

developing economies, was acquired to allow General Cable to expand its international operations.   General Cable placed Phelps Dodge and the entire ROW division under the supervision of Mathias Sandoval, who had been Phelps Dodge's CEO and President.

Plaintiffs assert that the Defendants failed to integrate Phelps Dodge into General Cable's internal management and financial reporting control systems, allowing "a multitude of material accounting irregularities to occur."   Doc. 97, Complaint, ¶ 6.   Further, Plaintiffs allege that the Defendants affirmatively shielded the ROW division from "meaningful financial supervision," *id.,* instead instructing corporate finance staffers not to interfere with ROW as it appeared to be a successful operation. *Id.* ¶ 5.

Allegedly as a result of this lax supervision, General Cable failed to detect not only the accounting errors but also a complex inventory theft scheme in the ROW division's Brazilian operation that resulted in the loss of millions of dollars' worth of raw materials and finished goods.   Plaintiffs assert that ROW division executives learned of the theft and other errors in January 2012 but did not notify General Cable's corporate headquarters until September 2012.

## B. Restatement of Financial Information – 2012 and 2013

On October 29, 2012, General Cable announced that financial statements filed between 2007 and second quarter 2012 contained material accounting errors and should not be relied upon.   The company further announced that it would be restating fourteen financial statements covering 2009 through Second Quarter 2012.

-3-

Then, on October 10, 2013, General Cable announced that it needed to restate the *corrected* financial statements, as well as three other publicly filed reports, to correct material errors related to (1) improperly recognized revenue on Brazilian "bill-and-hold" sales; (2) Value Added Tax (VAT) assets related to the missing Brazilian inventory; and (3) other accounting irregularities unrelated to Brazil. General Cable explained that it discovered these errors while remedying the errors that necessitated the first restatement.

Plaintiffs allege that the restatements are evidence that General Cable's financial statements for the fiscal quarters and years 2008 through First Quarter 2013 and related earnings releases were materially false and misleading, in violation of Generally Accepted Accounting Principles (GAAP). More specifically, Plaintiffs allege that Defendants violated GAAP by:

(1) inflating operating income, net income, and earnings per share by improperly recognizing bill-and-hold sales;

(2) understating cost of sales expenses and overstating operating income, net income, earnings per share, and inventory balances by improperly accounting for inventory and the related VAT assets in General Cable's Brazilian subsidiary;

(3) understating cost of sales expense and overstating inventory, property, plant & equipment assets, and comprehensive income by recording erroneous foreign currency adjustments in or related to its Canadian and Mexican subsidiaries; and

-4-

(4) improperly accounting for other transactions by understating expense accounts while overstating related asset accounts by improperly delaying the reporting of expenses or other charges.

Following the issuance of the Restatements, General Cable made significant changes in the ROW division, including adjustments to inventory-related processes and security in Brazil. Moreover, the ROW CEO and CFO resigned and numerous other managers in Brazil were terminated from employment. Kenny and Robinson assumed leadership responsibilities for the ROW division. Finally, General Cable took steps to better integrate ROW division financial reporting and communication. Doc. 97-2, Year 2012 Form 10-K/A, at 7-8.

## C. Facts Supporting Scienter

In the Corrected Consolidated Complaint ("Complaint") (Doc. 97), Plaintiffs also pleaded facts related to scienter, as they are required to do.

Plaintiffs assert that Kenny and Robinson knew or recklessly disregarded that adverse facts had not been disclosed to, and were being concealed from, the investing public. Specifically, Plaintiffs allege that Kenny and Robinson, through their positions as senior executive officers of General Cable, had direct access to confidential and proprietary information and an opportunity to commit fraud by way of their control of the contents of General Cable's public reports, filings, and press releases, and their participation in the company's management and operations. Doc. 97, Complaint, ¶¶ 20-22. Plaintiffs

-5-

also contend that Kenny and Robinson had motive to commit fraud because stock options and bonuses tied to stock price and earnings comprised significant portions of their compensation during the years covered by the restatements. *Id.* ¶¶ 129–30.

Plaintiffs also emphasize the nature and scope of the restatements, noting that General Cable was required to restate its financial information twice, that the restatements covered a lengthy period and numerous filings, that the required adjustments were material, and that errors were beneficial to General Cable's bottom line. *Id.* ¶¶ 35, 39, 47, 49, 53. Further, Plaintiffs allege that the time between the initial disclosure of the errors and General Cable's issuance of restatements was longer than average for public companies. *Id.* ¶ 50.

Plaintiffs also allege that General Cable's internal controls were ineffective and insufficient, despite Kenny and Robinson signing Sarbanes-Oxley certifications attesting to the controls' adequacy. *Id.* ¶¶ 51-52, 54-56, 58. Plaintiffs aver that Kenny and Robinson were bound by the company's Code of Ethics, which required them to follow internal controls to ensure accurate financial reporting. *Id.* ¶ 114. Plaintiffs allege that a proper evaluation of the company's internal controls would have alerted (or did alert) Defendants to the deficiencies leading to the restatements. *Id.* ¶¶ 60-61.

Next, Plaintiffs allege that Kenny and Robinson provided lax oversight of the ROW group, allowing accounting problems to persist. Specifically, they assert that Kenny and Robinson failed to insist

-6-

upon open communications between ROW upper management and the corporate controller. *Id.* ¶¶ 64-65. Moreover, they allege that Defendants failed to require the ROW division to fully explain its financial data to corporate finance leaders, instead instructing the controller and other finance staff to "back off" when they sought clarifying information from the ROW division. *Id.* ¶ 126.

Plaintiffs emphasize Defendants' failure to integrate the Phelps Dodge subsidiary into the parent company's internal control and compliance framework, instead allowing Phelps Dodge to continue its own internal financial control system. *Id.* ¶ 121. A confidential witness states that Kenny justified the lack of integration by saying, "Hey, [Phelps Dodge is] a successful organization, leave them alone, let them do their thing." *Id.*

Plaintiffs also allege that ROW accounting personnel were aware that several physical inventory counts did not match the Brazilian subsidiary's inventory records. *Id.* ¶ 34. Further, personnel in Brazil knew that the inventory module was "decoupled" from the General Ledger, such that adjustments to inventory did not automatically update the general ledger, making errors more likely. *Id.* According to confidential witnesses (an Account Manager and a Cost Analyst in Brazil), managers in the ROW division were aware of significant discrepancies between the physical inventory counts and the amounts shown in the accounting system but did not address them. *Id.* ¶ 122. Another confidential witness (CW 1) states that during finance meetings, the Brazilian operations were described as "a bit of a train

wreck. . . like a bunch of cowboys." *Id.* ¶ 125. Further, Plaintiffs assert that the measures General Cable implemented in response to the inventory control deficiencies were simple and could have prevented the harm to the company and investors if implemented sooner. *Id.* ¶ 127.[3]

As further evidence of scienter, Plaintiffs point to General Cable's recognition of revenue from bill-and-hold sales -- transactions structured to allow earnings to be recorded prematurely, and known to be "red flags" to the SEC, analysts, and investors. *Id.* ¶¶ 31, 46. According to Confidential Witness 3, who served as General Cable's Senior Vice President for Latin America during the Class Period, Robinson personally approved these transactions via e-mail. *Id.* ¶ 30.

## II. ANALYSIS

### A. Section 10(b) and Rule 10b-5 Claim

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Implementing this provision, SEC Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact

---

[3] Plaintiffs assert in their Response (Doc. 103, at 39), but not in the Complaint, that these measures included installing a working security camera and a truck scale at the Brazil facility to combat inventory loss.

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To prevail on a § 10(b) or Rule 10b-5 claim, a plaintiff must prove the following elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317-18 (2011). Defendants challenge only the sufficiency of the complaint with regard to scienter.

### 1. Standards for Pleading Scienter

The Supreme Court has defined scienter as a mental state embracing "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Sixth Circuit has held that in addition to knowing or intentional fraud, recklessness may also constitute scienter in a securities fraud action. *See In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999). Recklessness is "akin to conscious disregard" and is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* (citing *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)). The danger "need not be known," but "it must be at least so obvious that any reasonable man would have known of it." *Id.* An inference of recklessness typically requires "multiple, obvious red flags" -- "egregious refusal[s] to see

-9-

the obvious, or to investigate the doubtful." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 687, 695 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives,* 131 S. Ct. 1309.

In addition to Federal Rule of Civil Procedure 9(b), which requires a plaintiff alleging fraud to state the circumstances constituting fraud "with particularity," Plaintiffs must also satisfy the heightened pleading standards of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)(2).   The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4b)(2)(A).[4]

The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"   *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)(citation omitted).   Instead, courts must consider "plausible opposing inferences." *Matrixx Initiatives*, 131 S. Ct. at 1324.   "A complaint adequately pleads scienter 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"   *Id.* (quoting *Tellabs*, 551 U.S. at 324).   Pleadings that fail to meet this standard "shall" be dismissed.   15 U.S.C. § 78u-4(b)(3).

---

[4] Plaintiffs do not allege forward-looking statements, to which the PSLRA applies different scienter requirements.

-10-

## 2. Analytical Framework

In evaluating a securities fraud complaint, a court must review the allegations of scienter "holistically." *Matrixx Initiatives,* 131 S. Ct. at 1324.   A court's analysis of the sufficiency of a plaintiff's scienter allegations proceeds in three steps.   *See Tellabs*, 551 U.S. at 322-23.   First, a court must "accept all factual allegations in the complaint as true." *Id.* at 322.   Second, the court must "consider the complaint in its entirety," deciding whether the facts alleged, taken "collectively," give rise to a strong inference of scienter.   *Id.* at 322-23.   Finally, if the allegations present a "cogent" inference of scienter, a court is to evaluate competing inferences.   *Id.* at 323.

## 3. Evaluating Corporate Scienter

In determining whether a corporation has acted with the requisite state of mind, the pertinent question becomes, "Whose knowledge and state of mind matters?"   *See In re Omnicare Sec. Litig.*, 769 F.3d 455, 473 (6th Cir. 2014).   In other words, when can a court impute the scienter of a corporation's agent to the corporation?

The Sixth Circuit recently sought to clarify the answer to this question in *In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455 (6th Cir. 2014).   After reviewing several approaches, the Sixth Circuit determined that the states of mind of three categories of people are "probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter." *Id.* at 476.   These individuals are:

-11-

a. The individual agent who uttered or issued the misrepresentation;

b. Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;

c. Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance....

*Id.* (citing Patricia S. Abril & Ann Morales Olazábal, *The Locus of Corporate Scienter*, 2006 Colum. Bus. L. Rev. 81, 135 (2006)).

The Sixth Circuit explained that "a corporation is not insulated if lower-level employees, contributing to the misstatement, knowingly provide false information to their superiors *with the intent to defraud* the public" and noted that corporations that "willfully permit or encourage the shielding of bad news from management" may be liable. *Id.* at 477 (emphasis added). But, the Court explained, even if a corporate agent's state of mind can be imputed to the corporation under this standard, the complaint must still plead particular facts that give rise to a strong inference of fraudulent intent by that agent. *See id.* at 484 (explaining that even though an employee's knowledge could be imputed to the corporation, the plaintiff failed to plead sufficient facts to "give rise to a strong inference that [the corporation] acted to defraud the public").

**4. Application**

Viewed holistically and collectively, the facts pled here fail to give rise to a strong inference of scienter, much less one that is at

least as compelling as the opposing inference proffered by Defendants: that General Cable, Kenny, and Robinson were unaware of the problems leading to the restated financial results and that they addressed them when they became aware.

Initially, the complaint contains no particularized facts to support an inference that General Cable knew of the intentional misconduct occurring in Brazil and deliberately concealed it.[5] Thus, the Court focuses on indicia of recklessness -- particular facts that would suggest that Defendants had reason to know of the accounting problems and consciously disregarded them.

### a. Kenny and Robinson

Plaintiffs state a bevy of general allegations related to scienter, perhaps attempting to make up in quantity what they lack in substance. The bulk of these allegations would apply to any corporation that has restated financial results and thus a strong inference of scienter does not naturally follow.

For example, Plaintiffs cite Kenny's and Robinson's knowledge of company affairs due to their positions, their access to information, and their responsibility for financial reporting and internal controls, as proof of opportunity and intent to commit fraud. But Plaintiffs do not specify any instance where Defendants gained relevant knowledge through these channels and disregarded it. *See PR Diamonds,* 364 F.3d at 688 (explaining that fraudulent intent "cannot

---

[5] Plaintiffs admit this indirectly by their emphasis on Defendants' decision to allow the Phelps Dodge subsidiary to operate "without meaningful financial supervision" and on Defendants' failure to force the ROW group to provide the kind of financial information that would have given Defendants' knowledge.

-13-

be inferred merely from [high-level executives] positions in the [c]ompany and alleged access to information" and requiring complaints to instead "allege specific facts or circumstances suggestive of [executives'] knowledge"). Likewise, the bare allegation that Defendants were bound by General Cable's Code of Ethics and legally obligated to oversee compliance does not support an inference that Defendants knowingly or recklessly shirked those duties.

Plaintiffs similarly emphasize that Kenny and Robinson's incentive-based compensation gave them a motive to commit fraud. But again Plaintiffs fail to allege something more -- allegations of insider trading, for example -- from which to infer scienter.[6] *See In re Comshare,* 183 F.3d at 552 (finding plaintiffs' allegation that defendants stood to receive greater compensation if the company's

---

[6] In *Helwig v. Vencor, Inc.,* 251 F.3d 540, 550 (6th Cir. 2001) (en banc), *abrogated on other grounds by Tellabs,* 551 U.S. 308, the Sixth Circuit offered a nonexhaustive list of factors "usually relevant to scienter:"

> (1) insider trading at a suspicious time or in an unusual amount;
> (2) divergence between internal reports and external statements on the same subject;
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
> (4) evidence of bribery by a top company official;
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
> (6) disregard of the most current factual information before making statements;
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

The Court notes that Plaintiffs have not pled particular facts related to any of these factors.

-14-

stock price increased "probative of motive" where defendants *actually did profit* by selling their shares at artificially inflated prices during the class period); *cf. PR Diamonds,* 364 F.3d at 691 (noting that the absence of insider trading "dulls allegations of fraudulent motive" in cases where plaintiffs allege that defendants sought to personally enrich themselves through the fraud). Without other facts, these allegations could pin a fraudulent motive on any executive with stock-related incentive compensation.[7]

Plaintiffs next point to the "magnitude" of the restatements: the five-year period covered, the number of financial statements revised, the amount of time and effort General Cable needed to investigate and release the restatements, and the amount of money at issue.  The Sixth Circuit has stated that the "magnitude" of restatements can "serve to amplify the inference of scienter."   *PR Diamonds,* 364 F.3d at 685. But the *PR Diamonds* Court also stated that a strong inference of scienter flows only from "in your face" accounting errors that "cry out scienter" unless "additional 'specific, highly suspicious facts and circumstances'" are also cited.  *See id.* at 686, 695.  The accounting errors must be "drastic," "pervasive," and "egregious." *Id.* at 685-86.

---

[7] Although the complaint asserts generally that Kenny and Robinson received bonuses tied to stock price, it does not make any specific allegation that the inflated stock price during the Class Period was necessary to earn those bonuses.  Further, the complaint alleges no facts related to Kenny's, Robinson's, or any other General Cable official's trading activity before, during, or after the Class Period.  And, as Defendants correctly note in their Reply, Doc. 105, Plaintiffs' motive allegation as it pertains to stock option compensation does not make sense without allegations that Kenny and Robinson exercised or sold the options when the stock price was inflated.

Recalling that the majority of errors were the result of a complex theft scheme, the duration of the errors speaks less to Defendants' states of mind and more to the thieves' sophistication. Likewise, the opposing inference that the investigation and compilation of corrected financial data took longer than "average" due to the duration of the scheme is most plausible.

Moreover, Defendants have offered a compelling explanation for why two restatements were necessary: the errors necessitating the second restatement were discovered while remedying the first. *See* Doc. 97-2, General Cable 2011 Form 10 K/A, at 3 (noting that it discovered additional errors "in remediating the material weaknesses associated with Restatement No. 1").

As to the financial "magnitude" of the restatements, although General Cable erred by millions, the errors' relative financial impact was minimal (despite being material according to GAAP standards). For instance, the largest understatement of costs (FY2011) was $17.9 million, or 0.3% of the company's $5.2 billion cost of sales. This error's impact on Net Income and basic Earnings per Share was more significant, causing a 30% overstatement and 26.7% decrease, respectively. But, from a day-to-day management perspective, a deviation of 0.3% in costs would not raise an "obvious red flag."[8] *See Konkol v. Diebold, Inc.*, 590 F. 3d 390, 400 (6th Cir. 2009) (explaining that in a multi-billion dollar company, the amount of

_____

[8] The comparison is similar for overstatement of inventory. In 2011, for example, General Cable overstated inventory by $43.2 million, which represented 3.6% of total inventory and 0.9% of total assets.

-16-

improperly recognized revenue "would have to be significant to support a finding of scienter" and distinguishing improper revenue recognition from errors leading a company to report profits when it should have reported losses); *PR Diamonds*, 364 F.3d at 694 ("To support an inference of fraudulent scienter, allegations of GAAP . . . violations must extend in nature and magnitude beyond merely the materiality threshold.").

Plaintiffs also argue that it is highly suspicious that so many "errors" were in General Cable's favor.[9]  While scienter could be inferred from this circumstance, the argument ignores the origin of most of the errors: theft.  To operate without detection, a theft scheme must disguise the losses, as unexplained losses might elicit investigation and discovery.  Thus, any corporation victimized by theft would report inventories that were greater than the actual figures until discovering the theft.  Likewise, any error related to understatement of costs will lead to a "favorable" adjustment for the corporation.

Plaintiffs' allegations that General Cable was required to restate financial information, that restatements are uncommon, and that the required adjustments were material add little.  As Plaintiffs admit, *all* restatements correct material errors in prior financial statements because that is all GAAP permits.  *See* Doc. 97, Complaint, ¶ 44.  And the law is clear that fraudulent intent cannot be inferred

---

[9] Defendants remind the Court that not all errors in the original financial statements were in General Cable's favor.  *See* Doc. 98, at 12 (highlighting that restated figures for 2012 increased rather than decreased net income).

from the mere fact that a company makes a restatement. *See In re Comshare,* 183 F.3d at 553 (rejecting the argument that a "subsequent revelation of the falsehood of previous statements implies scienter" and noting that "mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud"); *PR Diamonds,* 364 F.3d at 694 ("To support an inference of fraudulent scienter, allegations of GAAP and GAAS violations must extend in nature and magnitude beyond merely the materiality threshold.").

Plaintiffs also argue that because General Cable issued a restatement in 2005 that involved inventory-related accounting problems, its restatements eight years later stemming from other inventory-related problems suggest fraudulent intent. Although one could infer that a prior inventory problem would put Defendants on notice to scrutinize inventory controls, the Sixth Circuit has rejected the argument that such circumstances can form the basis of a strong inference of scienter. *See Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495, 500-01 (6th Cir. 2013) (praising the district court's holding that even if a defendant company knew or should have known of a potentially problematic account, it does not reasonably follow that the company knew or should have known that the related financial statements were false).

Moreover, Plaintiffs describe the 2005 problems generally, *see* Doc. 97, Complaint, ¶ 117 ("controls over the recording of inventory shipments"; "controls over [] financial reporting"), and allege no

-18-

specific facts showing how the prior problems would cause Defendants to know of the later problems. Furthermore, that the inventory control problems occurred in a subsidiary that Plaintiffs admit was allowed to operate with *separate* internal control systems further weakens Plaintiffs' position. That General Cable had encountered problems in its own system does not support the inference that General Cable was on notice of problems in *another company's* system.

As to Kenny and Robinson's signing of Sarbanes-Oxley certifications, the Sixth Circuit has concluded that such acts are probative of scienter only "if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Konkol*, 590 F.3d at 402. Plaintiffs have alleged no facts to support an inference that Kenny and Robinson were severely reckless in signing the forms. Plaintiffs instead rely on the conclusory statement that, had the required internal controls evaluation been carried out properly, the errors would have been discovered. They argue, thus, that Defendants must have either known their certifications were false when made or Defendants must not have evaluated the company's internal controls at all. The facts alleged support neither conclusion. *See id.* at 403 (explaining that finding scienter under such facts would be equivalent to the 'classic fraud by hindsight case'").

The argument that Defendants' failure to implement "readily available" control measures supports an inference of scienter is similarly unavailing. Plaintiffs do not allege specific facts

-19-

suggesting that Defendants had reason to believe these controls were necessary or that Defendants considered them and recklessly rejected them.  Their failure to implement the measures thus suggests little about their state of mind.

Statements by confidential witnesses that individuals in Brazil knew about the inventory-related accounting problems suffer from the same flaw.  *See* Doc. 97, Complaint, ¶ 34, ¶ 122.  Plaintiffs allege no facts showing that Kenny or Robinson were aware of the discrepancies or Phelps Dodge managers' failure to address them.  Moreover, Plaintiffs do not allege that Kenny or Robinson, when confronted by a subordinate with bad news, had a policy of putting their heads in the sand.

Plaintiffs speculate that had the company implemented remedial measures earlier, the accounting errors and false statements could have been avoided.  Given that a complex theft scheme was at work -- one that employed efforts to *actively conceal* the inventory loss -- there is no guarantee that better internal control measures could have prevented the losses.  The thieves might simply have adjusted their strategy to continue avoiding detection.  *See In re Comshare*, 183 F.3d at 554 ("Claims of securities fraud cannot rest on speculation and conclusory allegations.")(internal quotations omitted).

Plaintiffs rely heavily on allegations that Defendants allowed Phelps Dodge to continue its own financial and internal control systems and shielded the ROW group from meaningful financial scrutiny.

-20-

If scienter were to be found in this complaint, these facts seem most likely to harbor it. But, again, the allegations are insufficient.

Sixth Circuit law is clear that courts should not "presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls." *In re Comshare,* 183 F.3d at 554. Moreover, Defendants' decision not to integrate Phelps Dodge into the company's general compliance framework, while perhaps imprudent in hindsight, is not evidence of scienter. It is not an "extreme departure from the standards of ordinary care" for a parent corporation executive to insist that his subordinates not micromanage a subsidiary. That, in hindsight, micromanagement might have been the wiser course is not relevant to a scienter analysis. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976) ("Negligent conduct cannot give rise to liability under § 10(b) or Rule 10b-5."). Plaintiffs allege no specific facts suggesting that Defendants made these business decisions for the purpose of concealing fraud or that Defendants ignored "red flags" in deciding not to integrate certain Phelps Dodge systems.

Plaintiffs' argument that confidential witness statements provide these "red flags" is unconvincing. Confidential Witness 1's statement that he or she participated in finance meetings where Brazilian operations were discussed and described as "a bit of a train wreck . . . like a bunch of cowboys," Doc. 97, Complaint ¶ 125, is properly discounted because it lacks context. Plaintiffs provide no facts linking Kenny or Robinson to these meetings. Moreover,

Plaintiffs do not specify the timing of these statements or identify which aspects of the Brazilian operations were like a "train wreck." These statements are irrelevant if not linked to the specific problems that led to the restatements.

Plaintiffs also emphasize Confidential Witness 1's assertion that Kenny justified the lack of integration by saying, "Hey, they are a successful organization, leave them alone, let them do their thing." *Id.* ¶ 121.  This statement suggests not that Defendants ignored obvious "red flags" but instead that they held a genuine belief that Phelps Dodge did not need closer scrutiny.

Most importantly, the inquiry is not whether management decisions related to ROW were prudent; the question is whether Defendants knew or should have known the financial statements were false when reported. *See Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495, 501 (6th Cir. 2013) (declining to find scienter even where the defendant corporation knew that a particular account was "potentially problematic").  The facts alleged simply do not lead to this inference.

Finally, Robinson's approval of bill-and-hold sales via email does not naturally lead to an inference of scienter because Plaintiffs allege no facts suggesting that Robinson knew or had reason to believe that the transactions were improper.  As Plaintiffs admit, bill-and-hold sales are not per se improper; they simply are subject to stricter revenue recognition criteria.  Plaintiffs also vilify Defendants for failing to disclose that General Cable recognized

-22-

revenue from bill-and-hold sales, allegedly because those transactions are "red flags" to the SEC and investors. Yet Plaintiffs describe no GAAP or other regulation that requires such a disclosure. Nor do Plaintiffs assert that General Cable's bill-and-hold practices were hidden from its auditors to avoid that heightened scrutiny.

Analyzing these allegations collectively, the complaint fails to support a strong inference of scienter as to either Kenny or Robinson.

### b. Corporate Scienter

Having found no facts from which to draw a strong inference of scienter as to Kenny or Robinson, the Court now looks to other actors whose states of mind might be imputed to the corporation.

At oral argument, Plaintiffs pointed to Sandoval, chief executive of the ROW group. The emphasis on Sandoval stemmed from an admission by General Cable in its 2012 Form 10-K/A (Doc. 97-2, at 7, attached to the Complaint), that "ROW executive management" became aware of allegations of theft and inventory accounting issues in January 2012 but failed to notify General Cable's executive management of the issues until September 2012. General Cable further admitted that "ROW executive management placed excessive emphasis on meeting business plan goals rather than on the integrity of the financial reporting process." *Id.*

In their Response (Doc. 103, at 16-18), Plaintiffs argue that Sandoval was one of these ROW executives and asks the Court to infer that he engaged in intentional misconduct by referring to facts contained in General Cable's March 28, 2013 Schedule 14A Proxy

-23-

Statement, Doc. 105-1, detailing General Cable's recoupment, pursuant to the corporation's "Clawback Policy," of a bonus award paid to Sandoval.[10]   This policy allows the corporation to recover incentive-based compensation from an executive in circumstances where the corporation is required to restate accounting data due to material noncompliance and the executive is found to have materially violated the corporation's Code of Ethics.  *Id*. Plaintiffs argue that scienter on the part of Sandoval can be inferred from these circumstances and then imputed to the corporation.

Although Sandoval -- as an individual who furnished information for financial reports -- falls within the categories of persons described in *Omnicare* whose knowledge may be imputed to the corporation, the allegations against him are nonetheless insufficient to support an inference of corporate scienter.   As discussed previously, to impute an agent's state of mind to the corporation, a complaint must allege particular facts to support a strong inference that the agent acted with the requisite state of mind.   Plaintiffs have failed to do so here.   Although Sandoval may have been aware of problems and failed to disclose them, there are no facts to support that he did so with intent to defraud.   Instead, the allegations support an inference that his intent was one shared by most corporate

---

[10] The Court notes that this proxy statement —— the first to mention Sandoval by name —— was not referenced in or attached to the Complaint and acknowledges Plaintiffs' Corrected Request for Judicial Notice (Doc. 106) of General Cable's Schedule 14A.   The Court need not decide whether these facts are properly before the Court because even assuming they are, Plaintiffs' scienter allegations pertaining to Sandoval fail for other reasons.

executives:  to  be  profitable  and  achieve  business  goals.  Not
surprisingly,  when  the  Court  asked  Plaintiffs'  counsel  during  oral
argument  to  identify  specific  facts  showing  Sandoval's  fraudulent
intent,  Plaintiffs'  counsel  struggled  to  answer.  As  such,  the  Court
concludes  that  scienter  cannot  be  imputed  to  General  Cable  based  on
allegations  related  to  Sandoval.

     Analyzing  the  allegations  collectively,  the  complaint  fails  to
support  a  strong  inference  of  scienter.  Plaintiffs  simply  lack  the
type  of  particularized  facts  that  would  lead  a  reasonable  person  to
find  a  powerful  or  cogent  inference  of  fraudulent  intent  as  to  any  of
the  defendants.  The  Court  thus  finds  that  Plaintiffs  have  failed  to
state  a  claim  for  securities  fraud  under  Section  10(b)  or  Rule  10b-5.

## B. Section 20(a) "Controlling Person" Claim

     Section  20(a)  of  the  Securities  Exchange  Act  provides  for  joint
and  several  liability  against  "controlling  persons"  --  those  who
"directly  or  indirectly"  control  any  person  liable  for  securities
violations  "unless  the  controlling  person  acted  in  good  faith  and  did
not  directly  or  indirectly  induce  the  act  or  acts  constituting  the
violation  or  cause  of  action."  15  U.S.C.  § 78t(a)(2012).  Thus,
Section  20(a)  claims  "are  predicated  upon  at  least  one  underlying
violation  committed  by  a  controlled  party."  *Frank v. Dana Corp.*, 646
F.3d  954,  962  (6th  Cir.  2011).  Therefore,  "[w]here  plaintiffs  do  not
state  a  claim  for  a  primary  securities  law  violation  under  Rule  10b-5,
dismissal  of  a  "control  person"  liability  claim  under  15  U.S.C.
§ 78t(a)  is  also  proper."  *Dailey v. Medlock*, 551  F. App'x  841,  849

(6th Cir. 2014) (citing *Ind. St. Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 947 (6th Cir. 2009)).  Because Plaintiffs fail to state a claim for a securities fraud, the Court concludes that their § 20(a) claims also fail.

### III. CONCLUSION

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that

(1)   Defendants' motion to dismiss (Doc. 98) be, and hereby is, **GRANTED**, and Plaintiffs' claims against Defendants be, and hereby are, **DISMISSED WITH PREJUDICE**; and

(2)   A separate judgment shall enter concurrently herewith.

This 27th day of January, 2015.



Signed By:

*William O. Bertelsman* WOB

United States District Judge

-26-